**WESTERN STAMPING CORPORATION**

v.

**UNITED STATES (Louis Marx & Co. Inc., Party in Interest).**

**C.D. 3554; Protest No. 67/7500–4666–67.**

United States Customs Court
Second Division.

Sept. 11, 1968.

Lincoln & Stewart, Washington, D. C. (Eugene L. Stewart and Thomas L. Delaney, Washington, D. C., of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Steven R. Sosnov, New York City, trial atty.), for defendant.

Barnes, Richardson & Colburn, New York City (Earl R. Lidstrom and Hadley S. King, New York City, of counsel), for party in interest.

Before RAO, Chief Judge, and FORD, Judge.

FORD, Judge:

This action was instituted by Western Stamping Corporation, an American manufacturer, pursuant to the provisions contained in 19 U.S.C., section 1516(b), against an importation of certain merchandise designated as a "Marxwriter 200", imported by the party in interest, Louis Marx & Co., Inc. The merchandise was classified by defendant as a nonautomatic typewriter with hand-operated keyboard under item 676.05, Tariff Schedules of the United States and admitted free of duty.

By a timely protest filed, plaintiff contends the Marxwriter is a toy and is, therefore, properly subject to classification as such under item 737.90, Tariff Schedules of the United States and subject to duty at the rate of 35 per centum ad valorem.

The pertinent portions of the provisions involved herein read as follows:

Item 676.05

Typewriters not incorporating a calculating mechanism:

Non-automatic with hand-operated keyboard . . . . Free

Item 737.90

Toys, and parts of toys, not specially provided for:

\* \* \* \* \* \*

Other . . . . . 35% at val.

*Schedule 7, part 5, subpart E headnotes:*

1. The articles described in the provisions of this subpart (except parts) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules, but the provisions of this subpart do not apply to—

\* \* \* \* \* \*

2. For the purposes of the tariff schedules, a *"toy"* is any article chiefly used for the amusement of children or adults.

*General Headnotes and Rules of Interpretation:*

10. *General Interpretative Rules.* \* \* \* (e) in the absence of special language or context which otherwise requires—

\* \* \* \* \* \*

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i. e., the use which exceeds all other uses (if any) combined; \* \* \*.

The record as made herein consists of the testimony of 7 witnesses called on behalf of plaintiff and 11 exhibits, 8 of which were offered on behalf of plaintiff and 3 on behalf of defendant. Mr. James E. Thomson, president of plaintiff corporation, testified that in 1952, he, with the assistance of machinists and mechanics, designed a toy typewriter for the predecessor of plaintiff herein which was intended to retail at under $20. He did not copy a commercial typewriter and the design differed from a commercial typewriter in respect to quality and quantity of the parts used. The design and production of the toy typewriter manufactured by them required a functional mechanism which could be inexpensively stamped and placed directly in the article without the necessity of hand work or secondary operations. In order to accomplish this, a number of unnecessary parts contained in a commercial typewriter were eliminated but in no way

interfering with the intended use. The article so produced must be substantial enough to withstand the dropping of said article by a child and remain in operable condition.

A portion of the testimony of this witness was directed towards the competitive aspect of all articles produced by his company and that of the imported article.

Mr. Thomson then testified that plaintiff's toy typewriter "Tom Thumb", and its imported "Petite" toy typewriter are distributed through the principal markets of the United States by the Henry Katz organization exclusively through toy distributor channels.

On cross-examination, the witness testified that the Tom Thumb typewriter can type 42 different characters while admitting that the Marxwriter, plaintiff's illustrative exhibit 2, prints a total of 84 characters. The difference in the number of characters was the result of the shift system which permitted the imported article to type both upper and lower case letters as well as symbols and punctuation marks. The witness further distinguished the imported article from a commercial typewriter indicating that the former did not contain such features as a line rule mechanism, margin setting releases, tabular mechanisms, and internal mechanism which are features of the latter design to provide a definite machine touch or feel for the typist. In addition, the imported article contains a 3-row keyboard whereas a standard typewriter contains a 4-row keyboard. The witness also admitted that plaintiff's illustrative exhibit 2 and a commercial typewriter possess the same character arrangement on the keyboard except for the fact that plaintiff's illustrative exhibit 2 contains the numerical characters on the middle row of a 3-row keyboard whereas said characters are on the top row of a 4-row commercial typewriter.

The next witness called on behalf of plaintiff was Mr. Henry Katz, the head of the Henry Katz organization, whose business is and has been for more than 50 years the sale and distribution of toys. Mr. Katz testified that he does not handle any products other than toys and that his organization distributes the products of Western Stamping Corporation through commercial toy channels in the United States. The toys are distributed by his organization through wholesale distributors, mail-order catalogue houses, variety stores, discount markets, and supermarkets; that annually during the months of February and March, a toy fair is held in New York for the purpose of displaying toys of all major United States toy manufacturers; that the party in interest displays their Marxwriter 200 at the toy fair.

Based upon the 50 years experience of Mr. Katz, he testified in his opinion he would define a toy as any kind of a gadget or any kind of an object that provides play value, amusement, and entertainment for a child. In his opinion, both the Tom Thumb and plaintiff's illustrative exhibit 2 fall within that category.

Mr. Louis N. Masters, vice president of Western Stamping Corporation, whose function is the overall management of the company and in particular the sales and administrative procedures of the company, testified that he personally contacted the organizations distributing Western Stamping Corporation's products including the Henry Katz organization, Alden's, Montgomery Ward, and Speigel and that he had dealt exclusively with the toy buyers for the departments of the national mail-order houses. The witness then identified a factory registration form, received as plaintiff's exhibit 4, for a Tom Thumb typewriter and testified that an identical registration form is packed with each toy typewriter manufactured by his company with instructions for the ultimate consumer to fill out and return to them the registration form. Under his direct supervision, a tabulation of those forms returned during 1965 was prepared and received in evidence as plaintiff's exhibit 5.

Dr. Alan C. Lloyd, editor in chief of all typing publications issued by McGraw Hill book company testified that he authored 52 publications on typing and

previously taught at the high school level and at City College of New York. The witness then identified the typing book created for the 10–12 year old age group which is currently used by over 16,000 fifth grade students in the United States. Said book was received as plaintiff's exhibit 6. Dr. Lloyd testified he examined plaintiff's illustrative exhibit 2 and tested its operation and that in his opinion said article should not be used as a machine to teach typing to children in the 10–12 year old age bracket. In his opinion, plaintiff's illustrative exhibit 2 is a "printing machine" and not a typewriter.

The characteristics of the machine disqualify it from any consideration, in his opinion, as one which could be used for teaching typing. Plaintiff's illustrative exhibit 2 does not possess a standard keyboard, margin sets, margin releases, and the spacing is irregular.

The witness admitted that he was able to achieve 52 words for one minute in operating plaintiff's illustrative exhibit 2, and that the average for most individuals is 35 words per minute.

Mr. Gale Mead, president of a retail and wholesale office machine distributor organization in the state of Michigan, testified that he has personally sold both portable and office typewriters in every state in the United States. He also has held various positions in the National Office Machine Dealers Association which is a nationwide organization comprised of independent office machine dealers. Mr. Mead personally examined plaintiff's illustrative exhibit 2, and it was his opinion that said exhibit was not a typewriter within the general concept of that term because it lacked certain equipment and contained a nonstandard keyboard. During all his experience in the typewriter industry, he has never encountered plaintiff's illustrative exhibit 2 being offered for sale by office equipment dealers and that in his opinion a shipment of plaintiff's illustrative exhibit 2 would not be considered good delivery for an order of typewriters. In his capacity as an officer of the National Office Machine Dealers Association, the question of whether members of said organization should repair or service articles such as plaintiff's illustrative exhibit 2 resulted in a policy by them of requesting the customer to return this article to their original source of repair.

Mr. Morris C. Fuller, Jr., vice president of sales of the S.C.M. Corporation, testified that his company manufactures typewriters which are sold throughout the United States and Canada under his direction. S.C.M. Corporation sells to 12,000 dealers and distributors throughout the United States. Mr. Fuller identified his company's low-end typewriter which was received as plaintiff's exhibit 7, as the least expensive commercial portable typewriter available in the United States market.

The witness testified he had previously examined plaintiff's illustrative exhibit 2 for the purpose of determining whether it was competitive with any of the S.C.M. products and that based upon this examination, it is his opinion that said exhibit is not competitive in any respect with any S.C.M. machine. Based upon his experience, he has never encountered an article such as plaintiff's illustrative exhibit 2 in typewriter sales channels and it is never handled nor distributed by any typewriter outlet in the United States. The witness was of the opinion that a shipment of plaintiff's illustrative exhibit 2 would not constitute a good delivery for an order of typewriters. Plaintiff's illustrative exhibit 2 is either a toy or a replica of a typewriter but does not correspond to the understanding of the term "typewriter" as that term is employed in the trade and commerce of the United States.

The next witness called on behalf of plaintiff was Raymond Haney, vice president of Product Planning of the S.C.M. Corporation. The witness testified that he is currently chairman of the American Standards Association Subcommittee on typewriters. This Subcommittee has the responsibility of developing typewriter standards and the standardization of typewriter elements. Mr. Haney

identified the American standards for a typewriter keyboard which was received in evidence as plaintiff's exhibit 8. The witness stated that he personally assisted in the preparation, drafting, and final approval of these standards. To his knowledge, all existing typewriters conform to this keyboard standard.

The witness had previously examined plaintiff's illustrative exhibit 2 for the purpose of determining whether the keyboard complied with the standards contained in plaintiff's exhibit 8. Plaintiff's illustrative exhibit 2 does not conform to the American standards due to the fact that a standard keyboard requires a total of 42 keys devoted to printing whereas plaintiff's illustrative exhibit 2 contains only 30 keys devoted to printing. In addition, plaintiff's illustrative exhibit 2 has a 3-row keyboard whereas the American standards require a 4-row keyboard. In addition thereto, the American standards have upper and lower case whereas plaintiff's illustrative exhibit 2 has three cases which is apparently achieved through utilization of a lower or standard case and two shifting levels. The witness admitted that the standards set forth in plaintiff's exhibit 8 are not compulsory.

Upon the record as made plaintiff urges, without opposition by either the party in interest or the defendant, that they are a proper party to this action. With this position, we are in agreement. Plaintiff has sufficiently established itself to be an American manufacturer of the same class or kind of article as that imported herein by the party in interest and has complied with the provisions of 19 U.S.C., section 1516(b), supra.

█ █ It is axiomatic in the field of customs jurisprudence that the classification by the customs officials is clothed with a presumption of correctness. When a product is classified or excluded from classification under a use provision, the presumption of correctness attaching to the decision of the customs official includes within such determination that said official determined the applicability or lack thereof of chief use. New York Merchandise Co., Inc. v. United States, 27 CCPA 117, C.A.D. 72. The classification of the imported merchandise as typewriters does not involve the question of chief use, but the claim of plaintiff herein as toys does. Accordingly, it must be presumed that the customs officials in classifying said merchandise as typewriters also found they were not chiefly used as toys or were elsewhere provided for under the tariff schedules.

█ In order to overcome the presumption of correctness, it is incumbent upon the party challenging the classification to establish by a preponderance of credible evidence that the imported merchandise is not a typewriter and is an article chiefly used for the amusement of children or adults as prescribed by headnote 2, subpart E, schedule 7 of TSUS.

█ Plaintiff in order to overcome the first burden imposed upon it by the presumption of correctness elicited the testimony of 4 qualified witnesses representing various segments of the typewriter industry in the United States. Their testimony that plaintiff's illustrative exhibit 2 is not commercially considered as a typewriter, is not sold or serviced through typewriter channels, contains a 3-row keyboard rather than a 4-row keyboard, and does not have margin sets, margin releases, and paper straightening device, etc., does not in and of itself negate the fact that the imported article is a typewriter. In fact, plaintiff's witness, Dr. Lloyd, admitted he was able to operate said exhibit 2 at the rate of 52 words per minute which is well above the average speed of a typist but below his normal speed. Considering all of the evidence adduced herein relating to the question of whether plaintiff's illustrative exhibit 2 is a typewriter, we must come to the conclusion that while the imported article may not be a perfect typewriter, it nevertheless, is a typewriter, cheaply constructed and not suitable for office use or instruction.

█ The clear weight of the authorities on the subject of toys is that a cheap-

ly constructed article or one that is less elaborate than a larger one of the same general kind is not necessarily a toy. By the same token, an article in the form of exhibit 2 is not removed from classification as a typewriter even though it lacks some of the features described by the witness.

In Louis Wolf & Co. et al. v. United States, 19 CCPA 132, T.D. 45258, small cheaply constructed phonographs were held to be phonographs even though they were considered to be "poor" phonographs. The court therein considered the phonographs to fall within the category of "junior edition" as set forth in United States v. Field & Co., 12 Ct.Cust.Appls. 543, T.D. 40738.

The case of United States v. Louis Wolf & Co., 26 CCPA 243, C.A.D. 23, involved the proper classification of certain microscopes. The merchandise therein was classified as toys and claimed to be microscopes and mountings as provided for in paragraph 228(b), Tariff Act of 1930. The court held said microscopes not to be toys in spite of the fact they were smaller, cheaper, and less elaborate than their larger counterparts.

The attorneys for the party in interest have set forth in their brief a comparison of the microscopes involved in the *Wolf* case, supra, and plaintiff's illustrative exhibit 2 herein. This chart reveals the striking resemblance between the articles in the 2 cases and is accordingly set forth below in full:

1. Both are less efficient than its more "standard" version.

| Microscope | Typewriter |
| --- | --- |
| The microscope had a magnification power of 20 to 60 times compared to "regular" microscopes which are expected to possess magnifications of 100 times up to 400–500 times. (26 CCPA at 245). | The Marx 200 is probably capable of a maximum typing speed of 52 words a minute, while "standard" typewriters are capable of greater speeds. (R. 27, 57, 60). The spacing is "irregular". (R. 56). |

2. Both are missing some features found in its more "standard" version.

| Microscope | Typewriter |
| --- | --- |
| "* * * it does not contain some of the specialized features or parts for bringing about certain results necessary in regular scientific laboratory work." (26 CCPA at 244). The eyepiece of three of the four microscopes involved had to be raised or lowered (focused) by a simple sliding method instead of the more sophisticated rack and pinion method. (26 CCPA at 244–245). | The Marx 200 does not have margin sets, or paper straightener. (R. 56). |

3. Both have features required to make them functional.

| Microscope | Typewriter |
| --- | --- |
| The microscope had an eyepiece and magnifying elements, stage | The Marx 200 has a keyboard containing all the let- |

| Microscope | Typewriter |
|---|---|
| and mirror acting as a light source, held together in a frame, so that objects such as hair, string and botanical specimens could be viewed. | ters of the alphabet and numerals, spacer, "type" and a platen around which paper is rolled, all contained in a suitable housing, so that textual material can be typed on paper. |

4. Neither article could be substituted for its more "standard" version.

| Microscopes | Typewriter |
|---|---|
| The microscopes were not used in laboratories. | The typewriter is not used in the place of "commercial" typewriters. |

———◆———

From the foregoing, it is apparent that plaintiff's illustrative exhibit 2, while differing to some extent in both construction and efficiency from the "standard" typewriters used in offices, is nevertheless in the form of and accomplishes the same result as a "standard" typewriter. In addition thereto, the imported article falls clearly within the common meaning of the term "typewriter." Typewriter is defined in Funk & Wagnalls Standard Dictionary (1963) as:

A machine for producing printed characters as a substitute for writing: it usually has a keyboard, depression of the keys serving to impress a type upon the paper through the medium of an inked ribbon.

The common meaning of a tariff term is a matter of law and not an issue of fact. The court is not bound by the testimony of witnesses as to the common meaning and may resort to lexicographic sources as an aid in determining said meaning. United States v. Tropical Craft Corp., etc., 42 CCPA 223, C.A.D. 598.

We, accordingly, are of the opinion that plaintiff has failed to establish the imported article not to be a typewriter.

Notwithstanding the fact that plaintiff has failed to negate the classification of plaintiff's exhibit 2 as a typewriter, the question of whether said article is a toy for tariff purposes must be considered by the court in view of headnote 1, subpart E, schedule 7, supra.

By statutory definition as contained in headnote 2, subpart E, schedule 7 of TSUS, the term "toys" is controlled by chief use. Being defined by the statute, it is not the subject of commercial designation. Therefore, it was incumbent upon plaintiff to establish that plaintiff's illustrative exhibit 2 or articles of the same class or kind were chiefly used for the amusement of children or adults.

Chief use is a question of fact which must be established by positive testimony relating to an adequate cross section of the nation. L. Tobert Co., Inc., American Shipping Co. v. United States, 41 CCPA 161, C.A.D. 544. Witnesses who have bought and sold similar articles over a period of years are qualified to give their opinion as to the use of the article. Their testimony is, however, merely advisory and not binding on the court. United States v. Bailey, Green & Elger, 24 CCPA 196, T.D. 48655. Sales to a particular class of trade without observation of the use of such article is insufficient to establish chief use. Strauss-Eckardt Co., Inc. v. United States, 18 Cust.Ct. 140, Abstract 51507; United States v. Ignaz Strauss & Co.,

Inc., 37 CCPA 32, C.A.D. 415. By the same token, proof of design and intendment cannot supply the requirement of proof of actual use. Dessart Bros. v. United States, 60 Treas.Dec. 553, T.D. 45169.

One of the latest pronouncements of this court on the subject of toys is contained in Wilson's Customs Clearance, Inc. v. United States, 59 Cust.Ct. 36, C.D. 3061. The court therein in considering the new definition of toys contained in the tariff schedules made the following observation:

> With the advent of the new Tariff Schedules of the United States, the definition of the term "toy" was changed to include articles used by adults. Under the definition appearing in paragraph 1513 of the Tariff Act of 1930, it was necessary to determine two things, namely, by whom is the article used and for what purpose. United States v. Calhoun, Robbins & Co., 21 CCPA 167, T.D. 46495. Although the first of these two determinations is now eliminated, the second subsists. * * *

 Based upon the foregoing principle of law, it is obvious that the testimony adduced by plaintiff with respect to the manner of sale, or the class to whom the Tom Thumb typewriter was sold, or the design of the article is insufficient to establish chief use. We are, of course, aware, as is urged by plaintiff of the principle of law that a sample is a potent witness. There is nothing, in our opinion, inherent in the character of plaintiff's illustrative exhibit 2, which would indicate in any manner that it is chiefly used for the amusement of children or adults. United States v. Sears, Roebuck & Co., 27 CCPA 235, C.A.D. 91.

 It is not, under the law, sufficient to establish chief use by children, as was attempted by plaintiff in introducing plaintiff's exhibit 5, the age tabulation of the users of the Tom Thumb model, since the definition of toys contained in headnote 2, supra, requires the purpose for which it is used, i. e., amusement. Hence, even if it were an uncontroverted fact that articles of the class of Tom Thumb toy typewriters were designed for and used exclusively by children, the most that the court could hold would be that said articles are chiefly used by children. This falls short of establishing the purpose for which they are chiefly used, i. e., amusement. In fact, plaintiff's own brochure contained in plaintiff's collective exhibit 1 and attached as exhibit A therein, states: "youngsters can do homework, learn spelling, improve letter writing and neatness," none of which is deemed by the court as constituting amusement.

We are, therefore, of the opinion based upon the record as made that plaintiff has failed to overcome the presumption of correctness attached to the classification of the "Marxwriter" as a typewriter. The protest is, therefore, overruled.

Judgment will be entered accordingly.