(C.D. 4300)

B. SHACKMAN & COMPANY, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided December 1, 1971)

*Serko & Sklaroff* (*Dennis M. Lamber, David Serko, Elizabeth E. Mills* and *Joel K. Simon* of counsel) for the plaintiff.
*L. Patrick Gray, III,* Assistant Attorney General (*Velta A. Melnbrencis,* trial attorney), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This case involves the proper rate of duty on items of merchandise—covered by the five protests listed below— that were entered at the port of New York in the period from November 18, 1963 to January 30, 1968. The items were classified by the government under item 737.90 of the tariff schedules as toys, not specially provided for, and assessed duty at the rate of 35 percent or 31 percent depending on the date of entry.[1]

Plaintiff contends that none of the imported items are toys because, it says, their chief use is for educational purposes rather than for the

---

[1] Presidential Proclamation 3822, 32 F.R. 19002, lowered the original 35 percent ad valorem rate to 31 percent ad valorem for merchandise entered on and after January 1, 1968, and prior to January 1, 1969.

amusement of children or adults. It therefore claims duty should be assessed on the basis of component material of chief value as follows:

| Protest No. | Invoice Description | Court Exhibit No. | Claimed Classification |
|---|---|---|---|
| 66/25969 | Educational number learner | Plaintiff's Exhibit No. 1 | 207.00, of wood, nspf |
| 67/37713 | Geometrical sorting board | Plaintiff's Exhibit No. 2 | 207.00, of wood, nspf |
| 66/20117 | Educational lock board | Plaintiff's Exhibit No. 3 | 207.00, of wood, nspf |
| 66/11721 | Educational time learner clock | Plaintiff's Exhibit No. 4 | 658.00, of base metal |
| 69/26719 | Educational magnetic spelling game | Plaintiff's Exhibit No. 5 | 774.60, of rubber or plastic, nspf |

The following are the relevant statutory provisions:

Classified under:

Schedule 7, Part 5

SUBPART E. – MODELS; DOLLS, TOYS, TRICKS, PARTY FAVORS

Subpart E headnotes:

1. The articles described in the provisions of this subpart (except parts) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules * * *

\*   \*   \*   \*   \*   \*   \*

2. For the purposes of the tariff schedules a "toy" is any article chiefly used for the amusement of children or adults.

\*   \*   \*   \*   \*   \*   \*

Toys, and parts of toys, not specially provided for:

\*   \*   \*   \*   \*   \*   \*

| 737.90 | Other _____ | 35% ad val. |
| | | 31% ad val. |

Claimed under:

Schedule 2, Part 1

### SUBPART F. – ARTICLES NOT SPECIALLY PROVIDED FOR, OF WOOD

Subpart F headnote:

1. This subpart covers all products of wood which are not provided for elsewhere in the tariff schedules.

207.00 Articles not specially provided for, of wood _____ 16⅔% ad val.

Schedule 6, Part 3

### SUBPART G. – METAL PRODUCTS NOT SPECIALLY PROVIDED FOR

Subpart G headnotes:

1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

\* \* \* \* \* \* \*

658.00 Articles of base metals not provided for in the foregoing provisions of this subpart, not coated or plated with precious metal__ 18% ad val.

Schedule 7, Part 12

### SUBPART D. – ARTICLES NOT SPECIALLY PROVIDED FOR, OF RUBBER OR PLASTICS

Articles not specially provided for, of rubber or plastics:

\* \* \* \* \* \* \*

774.60 Other _____ 15% ad val.

Other relevant statutory provisions:

General Headnotes and Rules of Interpretation

9. Definitions. For the purposes of the schedules, unless the context otherwise requires—

\* \* \* \* \* \* \*

(f) the terms "of", "wholly of", "almost wholly of", "in part of" and "containing", when used between the description of an

article and a material (e.g., "furniture of wood", "woven fabrics, wholly of cotton", etc.), have the following meanings:

(i) "of" means that the article is wholly or in chief value of the named material;

\* \* \* \* \* \* \*

10. General Interpretative Rules. For the purposes of these schedules—

\* \* \* \* \* \* \*

(e) in the absence of special language or context which otherwise requires—

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined;

\* \* \* \* \* \* \*

Component Material of Chief Value.

At the outset, it is basic that in a tariff classification case the plaintiff has the twofold burden of proving that the government's classification is erroneous and that its own claimed classification is correct. On this latter aspect it was thus part of plaintiff's burden to establish the component material of chief value of the five importations. More particularly, it was incumbent upon plaintiff to prove (1) that the three imported articles represented by plaintiff's exhibits 1, 2 and 3 are in chief value of wood; (2) that the article represented by plaintiff's exhibit 4 is in chief value of base metal; and (3) that the article represented by plaintiff's exhibit 5 is in chief value of rubber or plastic.

Generally, the proper method of determining the component material of chief value of an article is to ascertain the costs to the manufacturer of the separate parts of the article at the time they are ready to be combined into the completed article. *Plastic Service Co.* v. *United States*, 63 Cust. Ct. 528, 530, C.D. 3947 (1969), and cases cited. However, proof of the costs of each component need not be presented where even a casual examination of the sample discloses the material of chief value, *John S. Connor, Inc.* v. *United States*, 54 Cust. Ct. 213, 218, C.D. 2536 (1965), or "a *prima facie* showing is made by broad, conclusory statements of a witness who should know." *Broadway-Hale Stores, Inc.* v. *United States*, 63 Cust. Ct. 194, 199, C.D. 3896 (1969). In this latter situation, "[c]ounsel for defendant could then, as the circumstances may suggest, either (a) object that the testimony is opinion without a proper foundation, or (b) develop by cross-examination that

the statement is not based on facts, or that an incorrect way of determining value was used. Omission to do either would connote a willingness that component material of chief value might be decided on the basis of the *prima facie* showing and if nothing further transpired would for practical purposes be tantamount to a stipulation." *Chas. Kurz Co.* v. *United States*, 57 Cust. Ct. 73, 79, C.D. 2733 (1966).

In this case the record is completely devoid of any proof as to the cost to the manufacturer of the separate parts of the various imported articles at the time they were ready to be assembled. However, defendant concedes—and it is obvious from the samples—that "such proof of costs need not be presented as to the merchandise represented by plaintiff's exhibits 1 and 2 since [they] appear to be composed entirely of wood and hence * * * would be wholly and in chief value of wood."

With respect to plaintiff's exhibit 3—the "educational lock board"—examination shows that it consists of a wooden board about nine inches long, six inches wide, and three-quarters of an inch thick. It has three cutouts in the shape of doors and three wooden pieces, each about one-half of an inch thick, which are fastened to the board with hinges and fit into the cutouts. In addition there are three latches of varying design and three different types of screws, one with a nut. The hinges, screws and nut are of metal. The important consideration is that it is not possible to tell from examination whether the article is in chief value of wood, as claimed, or in chief value of metal.

As for plaintiff's exhibit 4—the "educational time learner clock"—examination shows that it consists of gears, a plate, a housing and hands, all of metal, and an obviously inexpensive plastic dial cover. Thus, it would appear from such examination that this item is in chief value of metal. However, to obtain classification under item 658.00, as claimed, plaintiff was required to show not only that the import is in chief value of metal but also the specific kind of metal it is. This additional requirement is necessitated by the language of item 658.00 which covers articles of base metal that are *"not provided for in the foregoing provisions of this subpart * * *"*—i.e., items 657.09 through 657.90 which cover articles of iron, steel, copper, nickel, lead, etc. [Emphasis added.] Thus to obtain classification under item 658.00, plaintiff was required to negate the applicability of items 657.09 through 657.90 by showing that none of the metals covered by those tariff items comprised the import's component material of chief value. And this showing plaintiff has not made—or even attempted. In fact, the record is devoid of any evidence as to what metal or metals are contained in the import. Cf. *Chas. Kurz Co.* v. *United States*, 57 Cust. Ct. 84, 89, C.D. 2734 (1966).

Coming to plaintiff's exhibit 5—the "educational magnetic spelling game"—examination shows that it consists of a decorated metal

sheet about six inches square and 31 plastic or rubberlike blocks bearing all the letters of the alphabet, plus an extra set of vowels. It is wrapped in a plastic film to which is attached a cardboard label describing its use. What this examination demonstrates is that the article consists of three components, a metal plate, letters made of plastic or rubberlike material, and a cardboard; it does not demonstrate that the article is in chief value of rubber or plastics, as claimed.

Plaintiff, however, contends that in addition to the samples, the testimony of plaintiff's president, Daniel Jacoby, establishes the component material of chief value of plaintiff's exhibits 3, 4 and 5. In this connection, Mr. Jacoby testified that he has been in the importing business for 35 years; that in his capacity as president of plaintiff, his functions are to negotiate and buy goods and to suggest ways to reduce costs of such goods; that in that capacity he has dealt directly with the manufacturers overseas, has seen how they operate and has discussed prices with them; that in connection with fixing prices, there is "constant negotiation on all items" which takes place "through the mail, through agents and direct" at least as often as twice a year; and that in order to know prices, he has to know "labor, materials, printing, boxing and so on."

With respect to plaintiff's exhibit 3—the "educational lock board"—(which, as previously indicated, consists of both metal and wood) the witness testified that he had last negotiated a price on the item with the manufacturer about three years before. He described the negotiations as follows (R. 182):

> The cuts in the board were not made properly. We discussed them, because it required a lot of labor—the cost of the board is a lot in Japan because wood is expensive and we put on a price after we purchased it.

He further stated that, based on his personal knowledge and the negotiations, the chief value of the item was wood.

With respect to plaintiff's exhibit 4—the "educational time learner clock"—when asked, based on his knowledge of cost of materials, labor and manufacturing, what was the component material of chief value, the witness Jacoby replied (R. 176):

> * * * The container is metal. The twister is metal. The plate is metal. The gears are metal. The only thing that is plastic is the top—the tiny crystal which is available at a very cheap rate. It is a production crystal that is used on other items. So, the value of this item is at least 95 to 97 per cent metal.[2]

[2] As discussed previously, casual examination indicates that plaintiff's exhibit 4 is in chief value of metal. However, for the reasons set out before, plaintiff has still not proven that the article is covered by item 658.00 in view of its failure to negate the applicability of items 657.09 through 657.90.

Finally, the witness testified as follows with respect to plaintiff's exhibit 5—the "educational magnetic spelling game" (R. 188)·:

> The magnetic letters are the expensive part of this exhibit. They are made of plastic. Plastic rubber. And, in relationship to the whole, they would run around 70 per cent. The plate would be 20 per cent. The cardboard envelope would be about ten per cent.

We cannot agree, however, that this testimony ·without more proves the component material of chief value of these exhibits. In the first place, the *costs* to the manufacturer of the separate parts of an article can only be proven through competent testimony by parties who, because of their duties, such as being in charge of the manufacturer's books and records are in a position to testify as to such costs. Thus in *Frank P. Dow Co., Inc., et al.* v. *United States*, 59 Cust. Ct. 697, R.D. 11370, 267 F. Supp. 1013 (1967), *modified on reh.*, 60 Cust. Ct. 758, R.D. 11469 (1968), evidence as to costs of material and fabrication was held to be without probative value because of the affiants' failure to allege that they had examined the exporter's cost record, were familiar or personally knowledgeable therewith, had made or supervised cost entries, or were familiar with cost accounting or maintained or kept such books. See also *Jaime Imports, Inc.* v. *United States*, 62 Cust. Ct. 798, R.D. 11627, 295 F. Supp. 307 (1969). Against this background, considering that Mr. Jacoby was associated with the *purchaser* from the manufacturer, not the manufacturer, he was scarcely competent to testify as to the manufacturer's costs. The fact that Mr. Jacoby might have negotiated prices which he paid to the manufacturer for certain importations on the basis of *prices* of labor, materials, printing, boxing, etc. did not mean that he knew what the manufacturer's *costs* were for the components of the instant importations.

Furthermore, even if Mr. Jacoby had been competent to testify as to the manufacturer's costs, at no time did he state the amount of the manufacturer's costs of any of the components constituting the articles in question at the time of their assembly. Certainly the court was entitled at the very least to be apprised of the cost figures which formed the basis for Mr. Jacoby's opinion and conclusion that plaintiff's exhibit 3 was in chief value of wood and that plaintiff's exhibit 5 was of "plastic rubber."

Finally, there was nothing to establish that the witness knew the various cost factors "at the time of exportation." The fact that there were constant negotiations as to price is indicative of fluctuating manufacturer's costs which would mean the costs in one year might not necessarily be the same as those of another year. Cf. *Ted L. Rausch et al.* v. *United States*, 60 Cust. Ct. 654, 661, C.D. 3487, 286 F. Supp. 576 (1968), in which more detailed information was held insufficient to establish the component material of chief value.

Thus, with regard to the educational lock board (plaintiff's exhibit 3), the educational time learner clock (plaintiff's exhibit 4), and the educational magnetic spelling game (plaintiff's exhibit 5), we need not consider whether the classification is erroneous. For on the record before us, it is apparent that plaintiff has failed to establish the correctness of its claimed classification for those items. Hence the three protests covering these items—66/20117, 66/11721 and 69/26719—must be overruled.

## Chief Use of Plaintiff's Exhibits 1 and 2.

This brings us to the question of whether the "educational number learner" (plaintiff's exhibit 1) and the "geometrical sorting board" (plaintiff's exhibit 2) were properly classified as toys, i.e., articles chiefly used for the amusement of children or adults, or whether they are, as plaintiff claims, chiefly used for educational purposes and hence not in the toy category. In this connection, plaintiff contends that the importations are specially designed teaching devices that are used in the "discovery method" of learning.[3] Defendant, on the other hand, claims that plaintiff has failed to establish that the importations are not chiefly used for amusement and contends, additionally, that the testimony and the samples support the classification of the imports as toys, i.e., articles chiefly used for amusement. In this context, the issue essentially is whether plaintiff has established that the importations represented by plaintiff's exhibits 1 and 2 are chiefly used for educational purposes rather than for amusement.

Plaintiff's exhibit 1—the "educational number learner"—consists of 15 pegs set into a rectangular board one-half-inch thick, with a surface measuring $11\frac{1}{2}$ x $2\frac{1}{2}$ inches. Its components are: A white block containing one hole which fits on the single peg at one end; next, two yellow blocks with two holes which fit on two perpendicular pegs; then three red blocks with corresponding holes which fit on three pegs

---

[3] The discovery method of education is a method whereby children are presented with materials which are themselves devices for learning. In a book by Dr. Jerome Brunner, *The Process of Education*, Vintage Books (1963), the discovery method is explained as follows (at p. 20):

> There is at least one major matter that is left unsettled even by a large-scale revision of curricula in the direction indicated. Mastery of the fundamental ideas of a field involves not only the grasping of general principles, but also the development of an attitude toward learning and inquiry, toward guessing and hunches, toward the possibility of solving problems on one's own. To instill such attitudes by teaching requires something more than the mere presentation of fundamental ideas. Just what it takes to bring off such teaching is something on which a great deal of research is needed, but it would seem that an important ingredient *is a sense of excitement about discovery—discovery of regularities of previously unrecognized relations and similarities between ideas, with a resulting sense of self-confidence in one's abilities.* Various people who have worked on curricula in science and mathematics have urged that it is possible to present the fundamental structure of a discipline in such a way as to preserve some of the exciting sequences that lead a student to *discover* for himself. [Emphasis added.]

arranged in a triangular fashion; next four green blocks which fit on four pegs arranged in a square; and finally five blue blocks which fit on pegs arranged in a rectangle, with a fifth peg in the middle.

Plaintiff's exhibit 2—the "geometrical sorting board"— consists of a flat rectangular wooden board approximately 8½ x 6 inches with various geometric cutouts in the shape of a square, a rectangle, a circle, a semicircle, an isosceles triangle and an equilateral triangle. Also contained in the set are different colored blocks that are shaped to correspond to the cutouts, with each block having a peg handle to facilitate its manipulation.

It is of course presumed from the classification of these imports as toys that they are chiefly used for amusement. However, it is important to bear in mind that educative qualities can remove an article from the toy classification. For example, in *F. F. G. Harper Co.* v. *United States*, 63 Treas. Dec. 948, T.D. 46423 (1933), parts of miniature steam engines were held not to be toys because they had educative qualities which made them "much more" than an article chiefly used for the amusement of children. In rendering its decision, the court stated (pp. 954–55):

> The weight of this testimony indicates that these articles in their imported condition are used by boys ranging in age from 9 to 15, and possibly by men also, whose hobby is making model steam engines; that *such use affords a great deal of interest*, much in the same way that women derive interest from embroidering; *also that such use is educational.* In fact, *the last witness's positive statement is that the chief use of these parts is educational.* We are convinced that although the building of such models would be a pleasant pastime, it would not afford such amusement as is afforded a child by playing with a ball or a top. Merriment and jollity would accompany a child's play with a ball or top; that is not the sort of amusement that would be derived from building a model engine with these parts. [Emphasis added.]

In *United States* v. *Calhoun, Robbins & Co.*, 21 CCPA 167, T.D. 46495 (1933), the court reviewed the classification of a so-called "stick trick" used by children to produce knitted strings which could then be made into decorative ornaments or mats. In holding that the stick trick was not a toy, the court stated (p. 169):

> It may be that a certain amusement is derived by a child from its use of the articles at issue, but, whether used by a child or by an adult, the thing produced, in its normal and intelligent use, is an article of utility, and it seems to us that, upon the whole record in the case, the use in production of such an article—the knitted string—outweighs what we think may be designated as the probable incidental amusement.

In *United States* v. *Louis Wolf & Co.*, 26 CCPA 243, C.A.D. 23 (1938), small microscope sets used in biological studies and by children

for homework were held not to be toys, with the court explaining its conclusion as follows (p. 249) :

> From the evidence in the case and the exhibits before us we think the merchandise at bar is not chiefly used for the *amusement* of children because, as we have hereinbefore stated, the interest which children display in the use of these microscope sets is not the character of "amusement" which a child gets from a toy or from an article which is essentially a plaything. [Emphasis in original.]

And in *Western Stamping Corporation* v. *United States* (*Louis Marx & Co., Inc., Party in Interest*), 61 Cust. Ct. 152, C.D. 3554, 289 F. Supp. 1016 (1968), where an American manufacturer was trying to prove that a "Marxwriter" imported by the party-in-interest was a toy rather than a typewriter, the court found that the plaintiff failed to show that the importation was used chiefly for the amusement of children. The court pointed out that (61 Cust. Ct. at 162) :

> * * * In fact, plaintiff's own brochure * * * states: "youngsters can do homework, learn spelling, improve letter writing and neatness," none of which is deemed by the court as constituting amusement.

In affirming this opinion in *Id.* v. *Id.*, 57 CCPA 6, 8–9, C.A.D. 968 (1969), the appeals court pointed out that:

> * * * There was no evidence directly showing that the chief use of the imported merchandise, or of similar items, was amusement. The noncommercial uses by children could well be educational, even though the items are sold by toy dealers or in toy departments. We therefore must affirm the Customs Court's holding that a chief use of amusement was not shown.

Thus it is evident from these cases that if the plaintiff can prove the chief use of exhibits 1 and 2 is for educational purposes rather than for amusement, the exhibits cannot be classified as toys. It is to be added, though, that the mere fact that an article has some incidental educational value or is used in school does not remove it from the toy category. Thus in *United States* v. *Meier & Frank Co.*, 5 Ct. Cust. Appls. 208, T.D. 34330 (1914), embroidery sets used in kindergartens for the amusement of children and their instruction in simple embroidery were held to be toys rather than embroidery articles under the Tariff Act of 1909. In short, whether an article which possesses both educational and amusement qualities is or is not a toy depends upon the essential character of the article; i.e., its chief use.[4]

---

[4] It would seem that Congress recognized that some toys have educational qualities for not only was this called to its attention at the *Hearings on Tariff Readjustment*, 1929, House Committee on Ways and Means, 70th Cong., 2d Sess., Vol. XIV, Schedule 14 (see pp. 7296–99, 7310, 7311 and 7316), paragraph 1513 of the Tariff Act of 1930 provided that an article chiefly used for the amusement of children is a toy for tariff purposes "whether or not also suitable for physical exercise or for mental development."

Chief use, in turn, is an issue of fact to be established on the basis of positive testimony representative of an adequate geographic cross section of the nation. *L. Tobert & Co., Inc., et al.* v. *United States*, 41 CCPA 161, C.A.D. 544 (1953). However, under certain circumstances chief use can be proven inferentially. See *New York Merchandise Co., Inc.* v. *United States*, 62 Cust. Ct. 674, C.D. 3847 (1969); *Border Brokerage Company, Inc.* v. *United States*, 65 Cust. Ct. 277, C.D. 4089 (1970) (appeal pending). In fact, the sample itself may be sufficient to overcome the presumption of correctness. *United States* v. *Colibri Lighters (U.S.A.) Inc.*, 47 CCPA 106, C.A.D. 739 (1960). And this is particularly true in toy cases where the sample can permit the drawing of inferences as to use nationally. *Fred Bronner Corp.* v. *United States*, 57 Cust. Ct. 428, C.D. 2832 (1966); *Wilson's Customs Clearance, Inc.* v. *United States*, 59 Cust. Ct. 36, C.D. 3061 (1967). Further, importers, merchants and executives concerned with ordering, selling, distributing and promoting an article have to know the article's chief use and may properly give testimony as to such use. *International Customs Service, Inc., et al.* v. *United States*, 63 Cust. Ct. 255, 259, C.D. 3905 (1969); *Novelty Import Co.*, v. *United States*, 60 Cust. Ct. 574, 582, C.D. 3462, 285 F. Supp. 160 (1968).

In this setting, plaintiff presented the testimony of six witnesses. Four were qualified experts in the field of education, while the other two were directly involved in the importation, sale and distribution of the imported articles. One of the latter was the assistant manager of the plaintiff company who testified that the importations are kept in a special section of the showroom where "educational devices" are displayed and were sold by him to schools and school suppliers. According to the witness, educative devices are those items that instruct, teach or implement a certain educative principle and do not merely amuse or divert a child, while toys are devices used by a child for amusement, entertainment and diversion and do not have any end constructive purpose.

Plaintiff's other witness in the category of importers and merchants was Mrs. Jeannette Karro who is vice-president of Cedco Distributors Corporation, a Long Island-based distributor of educational equipment and supplies. In the main the customers of the company are school systems, including the Board of Education of the City of New York and practically every board along the eastern seaboard. They also include special services, such as the Board of Educational Cooperative Services, a nationwide group with whom she has worked "all over the country"; the Association for the Help of Retarded Children; vocational boards; and private institutions and schools. Mrs. Karro herself was trained as a teacher of early childhood education and in her capacity as vice-president of Cedco is responsible for sales, for buying, and is in charge of the programming division which

sets up programs for special education. In addition to its wholesale school division, the company has a retail educational center where it sells to "educated parents." As part of her job, she travels and visits schools approximately two months out of the year.

She stated that she has purchased the exhibits in question and that it is necessary for her to know the end use of products in order to sell them. She has observed the use of the exhibits in the classroom and characterized them as a "part of our program materials." She testified that the importations are intrinsically educational devices that perform a basic educational service in preschool since they stimulate a child to the point where he will want to "discover." She further testified that from her observation a child was "excited" when using the imports rather than "amused" and indicated that by excitment she meant the mental stimulation a child obtains in the act of educational "discovery." She added that by using the geometrical sorting board "a child learns to discern differences in shapes and form, and this is a primary function in learning to recognize the alphabet as well as other types and shapes and forms."

Plaintiff also presented the testimony of four well-qualified educators who had extensive experience with the use of educative devices identical or similar to plaintiff's exhibits 1 and 2. One of these was Miss Adeline Miseo, a recently retired elementary school principal, who, in addition, had abundant experience as an assistant principal and as a classroom teacher of primary grades. Her duties entailed the direction, supervision and developmental training of teachers. She was familiar with items similar to the importations and has purchased them for her schools. The items, according to this witness, are used by children alone or as "representative demonstration educational devices" from which teachers present different lessons. Then the child could take such a device and practice what he learned. She indicated that the children were "interested" in these articles rather than being amused by them, and added that "that is the big factor in learning, to capture the child's interest."

The witness stated that plaintiff's exhibit 1, the "number learner," can be and is used to teach a number of lessons, such as shape, color and sequence of numbers. It is very useful, she said, in teaching mathematical concepts, and is also excellent for demonstrations such as having children hold up appropriate blocks in the set in answer to "show me three," etc. According to the witness, no instruction is needed for the "number learner" and children will use this device by itself; however, the best value is derived by someone eliciting the many concepts that can be taught.

The witness further testified that plaintiff's exhibit 2, the "sorting board," is used in the mathematics' area in the kindergarten, first and second grades. The device, she added, teaches geometric shapes; the

teacher can use this or a larger model for demonstration or have the children use it for outlining squares or circles.

Another plaintiff witness—Mrs. Deborah Goodwin—taught in the New York City Public School System for 13 years before going to work with Dr. Jerome Brunner, Director of The Center for Cognitive Studies at Harvard University, who is responsible for founding the discovery method of education. Working with Dr. Brunner, the witness designed materials in connection with a curriculum so that children would learn from the materials themselves. Some of the processes that evolved have been implemented in the New York City Public School System. Mrs. Goodwin uses materials similar to the importations "everyday" in her work and believes that these articles have an educative purpose. Her children frequently work with these devices independently and learn on their own.

The witness who defined a toy as "a device * * * whose main purpose is amusement" did not consider the number learner and geometrical board to be toys but considered them to be "[e]ducational devices" "[b]ecause they are inherently of a learning, educational nature."

Two other experienced educators called by plaintiff indicated that they had heard all the testimony regarding the chief use of the importations and would testify in a similar manner that they are chiefly used for educational purposes.

Contrasted with this testimony is the testimony of five witnesses for the defendant—two teachers and three parents whose children had used items similar to some of the importations. Defendant's first witness, Miss Judy Alpern, holds a Master's Degree in Education and has taught the first grade in the New York City School System for three and one-half years. She was familiar with items similar to plaintiff's exhibits 1 and 2, which she considered to be "educational toys." The witness defined "educational toys" as: "Things that the children play with, that they are amused by—things that they have fun with, that also may help them to get ready for learning specific skills later on." Educational devices are limited, in her opinion, to textbooks and workbooks used under a teacher's supervision. Miss Alpern testified that she had used articles similar to exhibits 1 and 2 in her classroom. She agreed that in contrast to a ball, there is something inherently educational in the use of exhibit 1 and that if in using it a child learns to put five blocks on five pegs, it was a learning experience. She further agreed that the imported "sorting board" has "some degree of learning." However, the witness indicated that even though the imports illustrated an educational point, she still considered them toys because children enjoy playing with them.

This testimony was supported by that of Mrs. Marilyn Goldstein who teaches preschool and nursery in White Plains, New York, and

also runs a summer day camp. She indicated that she had a Bachelor of Arts Degree from Brooklyn College but did not know when or approximately when she received that degree. She also stated that she was "working" for her Master's Degree but later changed this to say she intended to start working for her Master's. Eventually she stated that her education was "mostly all experience at this point."

Mrs. Goldstein stated she had observed the children at her nursery school "play" with items similar to the importations and considered them to be toys. She defined "play" as "* * * what I see a child do or what I enjoy doing myself, such as tennis or whatever. Whatever you enjoy doing is play—like eating."

Of the three parents testifying for defendant, only one parent had purchased an item similar to the two imported articles, exhibits 1 and 2, that remain for our consideration. In this connection, Mrs. Teresa Dondrea of Iselin, New Jersey, the mother of three children ages 5, 6 and 7, testified that she purchased two items of a similar nature to exhibit 2 for her children and a third as a gift for someone else. As to two of the items, she testified that her children "took the shapes out and put the shapes in." However, she offered no evidence as to the children's reaction.

On the basis of the foregoing testimony, plaintiff has proven by a clear preponderance of the evidence that the importations are not chiefly used for amusement but rather are chiefly used for educational purposes. In the first place, plaintiff's witnesses were not only well qualified but their testimony was credible and persuasive. That testimony showed that a new theory of early childhood education known as the "discovery method" has been developed over the past decade, based on the premise that a child learns best from actually participating in the learning process rather than learning by rote, as had previously been the case. The testimony showed further that since the discovery method has been developed devices such as exhibits 1 and 2 have become commercially available therefor and that their chief use is for educational purposes. Cf. *Ross Products, Inc.* v. *United States*, 48 CCPA 1, C.A.D. 752 (1960).[5]

---

[5] In *Ross Products*—which defendant relies on—the court upheld the classification of rubber balls as toys. According to the court, the fact that the balls were designed and used for physical exercise did not *ipso facto* prove they were not used chiefly for the amusement of children. The court found it difficult to believe that the children using the balls would not be amused even though that amusement involved the element of exercise. Although the court recognized there was a "duality of use" for the balls, based on the evidence presented, the court was not convinced that the amusement derived by the children was an "incidental use" rather than the chief use as presumed from the collector's classification in paragraph 1513. The present case is entirely distinguishable however. For in the present case the record demonstrates that while both plaintiff's exhibits 1 and 2 may have a potential for amusement, their chief utility and use is for educational purposes. See *Fred Bronner Corp.* v. *United States*, 57 Cust. Ct. 428, 436–37, C.D. 2832 (1966), where the government's classification of miniature antique classic cars as toys was overruled even though they possessed a potential for amusement because they were predominately used for display or decoration purposes.

It is to be added that we cannot give much probative weight to the testimony of defendant's witnesses. Defendant's witness, Miss Alpern, for example, testified that educational devices are limited to textbooks and workbooks and under a teacher's supervision. This testimony, however, is contrary to the development of the discovery method whose object is to get away from textbooks and workbooks as the sole tools of teaching and to use other educative materials which stimulate the child to learn. Beyond that, it is significant that Miss Alpern conceded that in contrast to a ball there is something inherently educational in the use of plaintiff's exhibit 1 and that plaintiff's exhibit 2 has some degree of learning. With respect to the testimony of Mrs. Goldstein, defendant's other teacher witness, it is to be noted that she first stated that she was "working" for a Master's Degree but later changed this to say that she *intended* to *start* working on it. It is also to be noted that she could not remember when or even approximately when she had received her B.A. degree. In light of these considerations and in view of her later statement that her "education is mostly all experience at this point," her testimony manifestly cannot be given as much weight as that of plaintiff's witnesses in the educational field. Further, the thrust of Mrs. Goldstein's testimony that "play" is "whatever you enjoy doing" is so broad as to encompass almost every activity in which a child participates and hence is of little probative value. Finally, the testimony of one parent, Mrs. Dondrea, that she had bought two of the items similar to exhibit 2 for her children and that they took the shapes out and put them in is inconclusive in the absence of any testimony whatever as to the children's reaction.

What is more, examination of the samples underscores the conclusion that plaintiff's exhibits 1 and 2 are designed for educational purposes. Thus even the most casual examination of exhibit 1—the "number learner"—indicates its suitability for enabling children to learn number relationships and colors. And a similar examination of exhibit 2— the "geometrical sorting board"—indicates its suitability for enabling children to observe and learn the properties and relationships of various geometric shapes and colors.

Finally, defendant argues that the legislative history of a 1966 enactment, 80 Stat. 1524, amending item 851.15 of the tariff schedules, gives support to its position that the present imports are properly classifiable as toys. The facts are these. In 1966, a bill (H.R. 11216) was introduced in Congress to amend the tariff schedules to allow certain special educational materials—necessary to the Montessori method of teaching— to enter the country duty-free.[6] Subsequently, the Senate Finance Com-

---

[6] The Montessori system is a method of learning in which the child proceeds at his own pace in an environment controlled to provide the means of learning. Specially designed teaching materials are the heart of the process. See 112 Cong. Rec. 800, 2762 (1966).

mittee reported the bill favorably as follows (S. Rept. 1600, 3 U.S. Code Cong. and Adm. News, 89th Cong., 2d Sess., pp. 4403–04 (1966)) :

The committee was advised by the Tariff Commission that the instructional materials and equipment used by the Montessori schools are quite varied. A portion of them consists of common articles of everyday use, and such articles as dishes and vases are most often obtained by each school from local stores and dealers. On the other hand, a number of sets of articles which are not available in local markets are fabricated to specification (precise lengths, widths, shapes, colors, and the like) by authorized manufacturers, none of whom is presently located in the United States. The sets presently produced collectively contain many hundreds of small individual pieces and are made of various materials but mostly of wood.

Although the sets are fabricated to specification and designed for the classroom instruction of children, *a number of them are not distinctively different from common articles of commerce sold as educational toys or play items.* For example, some of the sets consist of alphabet blocks, sets of small flags of the nations of the world, jigsaw type puzzle layouts, small tuned bells, maps, geometrical solids, etc. Included in the materials are so-called dressing frames which consist of frames on which have been stretched simulated parts of garments designed to enable children to learn to button clothing, lace shoes, fasten zippers, etc. Some of the articles consist of bottles, boxes, or other containers or holders into which are placed fragrant materials, hot or cold materials, etc., for the purpose of developing in children sensory perceptions of smell and touch. Some of the individual sets are put up in substantially built holders (e.g., boxes and small chests) for storage of the sets when not in use.

\* \* \* \* \* \* \*

*Under present law, most Montessori teaching aids would be dutiable, at a rate of 16 2/3 percent, as articles of wood not specially provided for.* Some are dutiable at 20 percent or 25.5 percent while others are duty-free as maps and charts imported exclusively for use by an educational institution.

The Committee on Finance sees no reason to continue a duty on the teaching aids needed under the Montessori or similar methods of instruction while general types of teaching aids are already tariff free. Accordingly, it has approved an amendment to conform the tariff treatment of these teaching aids to that presently available for most other instructional aids. For this duty-free treatment to apply, however, the articles involved must be imported "exclusively for the use of the institution involved." Moreover under rulings of the Customs Service the duty-free treatment will not apply if the institution is organized or operated for profit-making purposes.

The amendment providing duty-free treatment for these teaching aids describes the eligible articles to include letters, numbers, arithmetical materials, blocks, and other dimensional shapes, geometrical figures, tuned bells, and basic materials (not including

musical instruments) for understanding music, and their containers. It is required, however, that the articles must be fabricated to specification and must be designed for the classroom instruction of children. This requirement distinguishes ordinary toys from true Montessori-type teaching aids and prevents avoidance of the tariff on toys. [Emphasis added.]

The proposed amendment to item 851.15 subsequently became part of 80 Stat. 1524 and is applicable to articles entered or withdrawn from warehouse for consumption on or after November 10, 1966.[7]

Against this background, defendant notes that item 851.15 covers, among other things, "arithmetical materials * * * blocks and other dimensional shapes; geometrical figures, plane or solid * * *." It points out that "these are articles of the same kind or class as those before this Court" and adds that "Congress did not choose to lower duty or give preferential treatment to all articles which can or are used in schools or as teaching aids, but * * * specifically exempted only those which are fabricated to specifications, designed for the classroom instruction of children and are exclusively for the use of the institution involved, and not for distribution, sale, or other commercial use within five years after being entered." Thus, according to defendant, there was Congressional realization that those articles that were not so exempted would continue to be treated as toys for tariff purposes.

It is true that under the provisions of item 851.15 Congress intended that the articles here in issue, not being imported solely for use by nonprofit organizations, would not be admissible duty-free. However, it does not follow, as defendant argues, that Congress intended that such articles are therefore dutiable as toys. Indeed, the Congressional understanding appears to be that most of these articles would, even absent the amendment, be dutiable not as toys but rather as articles of wood, not specially provided for. Thus, the Senate Finance Committee Report (quoted before) states in part: "Under present law, most Montessori teaching aids would be dutiable, at a rate of 16⅔ percent, as articles of wood not specially provided for."

From the foregoing we conclude that the imports represented by plaintiff's exhibits 1 and 2 are chiefly used for educative rather than

---

[7] As thus amended, item 851.15 reads as follows:

851.15   Letters, numbers, and other symbols; number cards and other arithmetical materials; printed matter; blocks and other dimensional shapes; geometrical figures, plane or solid; geographical globes; tuned bells and basic materials for understanding music; model articles and figures of animate objects; puzzles and games; flags; dressing frames; dummy clocks; bottles, boxes and other containers or holders; all the foregoing, whether or not in sets, fabricated to specification and designed for the classroom instruction of children; and containers or holders fabricated to specification and designed for the storage of such instructional articles when not in use_____   Free

for amusement purposes. They are, therefore, properly classifiable not as toys under item 737.90 but as articles not specially provided for, of wood, under item 207.00, with duty at the rate of 16⅔ percent. Accordingly, the protests in 66/25969 and 67/37713 are sustained while, as previously indicated, the protests in 66/11721, 66/20117 and 69/26719 are overruled. Judgment will be entered accordingly.