**WESTERN STAMPING CORPORATION,**
Appellant,

v.

**The UNITED STATES (Louis Marx &
Co., Inc., Party-in-Interest), Appellee.**

Customs Appeal No. 5332.

United States Court of Customs
and Patent Appeals.

Nov. 6, 1969.

Marvin Jones, Senior Judge, dissented.

Eugene L. Stewart, Washington, D. C.,
attorney of record, for appellant.

William D. Ruckelshaus, Asst. Atty.
Gen., Andrew P. Vance, Chief, Customs
Section, Herbert T. Posner, U. S. Dept.
of Justice, Civil Division, Customs Section, for the United States.

Barnes, Richardson & Colburn, New
York City, for party in interest. Hadley
S. King, New York City, Earl R. Lidstrom, Chicago, Ill., of counsel.

Before RICH, Acting Chief Judge,
JONES, Judge, sitting by designation,
and ALMOND, BALDWIN and LANE,
Judges.

LANE, Judge.

This is an appeal from the judgment
and decision of the Customs Court, 61
Cust.Ct. 152, C.D. 3554 (1968), overruling appellant's protest against the
classification of merchandise imported
by the appellee party-in-interest. The
appellant is a competing American manufacturer who instituted the protest under
19 U.S.C. § 1516(b).

The United States and the importer
are in agreement that the items should
be classified as typewriters under TSUS
Item 676.05,[1] duty free. Appellant contends the classification should have been
toys under TSUS Item 737.90,[2] 35% ad
val.

The machines are described in the record as being able to write 84 characters,
upper and lower case, and having three
rows of keys with the letters arranged
relative to each other as on a standard
typewriter. One witness, an expert typist, said he was able to type 52 words on
the machine in one minute. There is
evidence that similar items were designed by appellant to sell for under
twenty dollars.

The Customs Court overruled the protest on the grounds that the protester
had not carried either of the two burdens
of proof imposed upon him: to show by
a preponderance of the evidence (1) that
the items are not classifiable as typewriters; and (2) that the items were
properly classifiable as toys. We find
no reason to reverse the Customs Court.

---

1. "Typewriters not incorporating a calculating mechanism: Non-automatic with
hand-operated keyboard."

2. "Toys, and parts of toys, not specifically
provided for: * * * Other."

It is well known in customs jurisprudence that the two burdens mentioned above are placed upon a protester because of the presumption of correctness which attaches to the collector's classification. See Seagram & Sons v. United States, 30 CCPA 150, 157, C.A.D. 227 (1943); United States v. Gardel Industries, 33 CCPA 118, 121, C.A.D. 325 (1946); Bob Stone Cordage Co. v. United States, 51 CCPA 60, 65, C.A.D. 838 (1964).

To carry the second burden mentioned above the protester was obliged to show that the items in question were toys within the meaning of the Tariff Schedules. In Schedule 7, Part 5, Subpart E, headnote 2, we find the following definition: "For purposes of the tariff schedule, a '*toy*' is any article chiefly used for amusement of children or adults." (Emphasis in original.) The protester's burden, therefore, was to show that the chief use of the items in question was amusement. This he attempted to do by introducing evidence that the items were unsuitable for office use, that they were unsuitable for formal instruction in typewriting, that the principal owners of similar items of the appellant were children, and that the only wholesale purchasers of these similar items were toy buyers. The appellee in interest introduced in evidence a "Petite Typewriter" with carrying case and instructions, sold by the appellant. The defense also introduced the instructions accompanying one of the imported typewriters which had been introduced in evidence by appellant.

In weighing the evidence the Customs Court noted that "plaintiff's own brochure * * * states: 'youngsters can do homework, learn spelling, improve letter writing and neatness,' none of which is deemed by the court as constituting amusement." The court pointed out that while the evidence may have shown the chief users to be children, it did not show the chief use to be amusement, as required by the schedule.

Chief use is a question of fact. L. Tobert Co., Inc. v. United States, 41 CCPA 161, 164, C.A.D. 544 (1953). This court will not reverse the lower court on a question of fact except where the findings are without evidence to support them, or are clearly contrary to the weight of the evidence. United States v. F. W. Myers & Co., 45 CCPA 48, 52, C.A.D. 671 (1958); United States v. Charles Garcia & Co., 48 CCPA 140, 143, C.A.D. 780 (1961). In this case both a presumption and evidence operate to support the decision of the Customs Court, and we cannot say that the decision below was clearly contrary to the weight of the evidence. There was no evidence directly showing that the chief use of the imported merchandise, or of similar items, was amusement. The noncommercial uses by children could well be educational, even though the items are sold by toy dealers or in toy departments. We therefore must affirm the Customs Court's holding that a chief use of amusement was not shown.

Since the appellant's case failed on the second burden, we need not consider the issue of whether the items in question were typewriters.

The judgment is affirmed.

Affirmed.

MARVIN JONES, Senior Judge (dissenting).

I believe that the appellant successfully carried the two burdens of proof customs jurisprudence imposes on protesters.

Initially, the appellant proved by a preponderance of the evidence that the items in question are not classifiable as typewriters. The commercial meaning, not the common dictionary definition, of the word "typewriter" controls in this case. It is a fundamental principle of customs law that commercial meaning will be followed if it differs from the common definition and if its use is well established in the trade. Cadwalader v. Zeh, 151 U.S. 171, 176, 14 S.Ct. 288, 38 L.Ed. 115 (1894). It must be shown that the commercial meaning is definite, uniform, and general. Maddock v. Magone, 152 U.S. 368, 371, 14 S.Ct. 588, 38 L.Ed. 482 (1894). The party relying on the commercial meaning is obligated to of-

fer evidence in order to meet these requirements. United States v. Simon Saw & Steel Co., 51 CCPA 33, 38, C.A.D. 834 (1964).

The appellant met the obligation. Two of his witnesses testified as to the commercial meaning of the word "typewriter." Raymond Haney, Vice President for Product Planning of the Smith-Corona Marchant Division of the SCM Corporation and Chairman of the American Standards Association Sub-Committee on Typewriters, testified that he had assisted in the drafting of standards for typewriter keyboards. These standards call for 42 keys situated on four rows with two shift levels, i. e., an upper and lower case. While the standards are not compulsory, all typewriters have come to comply with them.

Gale Mead, who was involved in the wholesale and retail distribution of office machinery as President of Mead-Columbia, Inc. and Gale Mead Wholesale, Inc. and who has formerly held several offices, including president, of the National Office Machine Dealers Association, testified that a commercial typewriter can take a block of ten pieces of typing paper.

These witnesses and others stated that the imported article, designated by the Louis Marx & Co. as "Marxwriter 200" did not come within the commercial meaning of the word typewriter. Witness Haney testified that it did not meet the keyboard standards as it had only 30 keys on three rows with three shift levels. Witness Mead concluded that it could not be " * * * commercially used as a typewriter, in the general concept of a typewriter. It doesn't have the necessary equipment; it won't handle the abundance of different type paper that a typewriter is supposed to in normal use. The keyboard is not standard all the way through; and basically, lack of equipment."

When asked what the imported article was in his opinion, Morris C. Fuller, Jr., Vice President for sales of SCM Corporation, answered, "I would say it is a toy or replica of a typewriter. To nearly approach an office keyboard, it doesn't approach it at all." He further answered that it did not correspond to his understanding of the meaning of the word "typewriter" as that word is used in the trade and commerce of the United States.

Dr. Alan C. Lloyd was the Editor-in-Chief of all McGraw Hill Book Co. publications on typewriting. He was also a former typewriting teacher and editor of shorthand and typewriting magazines. He had published 52 text books and articles on typewriting. Over 50 percent of the people being taught typewriting at the time of trial were using his works. This expert testified that the imported item was unacceptable as a typewriter. He stated that he could not give instructions on it, since it had no standard keyboard, no margin sets, no margin release, no device for properly and efficiently straightening the paper and because the spacing is irregular. Ordinarily on a regular commercial typewriter Dr. Lloyd could type 85–90 words a minute. On the item in question he could at best achieve slightly more than one-half his normal speed.

The imported article probably comes within the broad, all-inclusive dictionary definition of the word "typewriter," e. g., Webster's Third New International Dictionary, 2476 (1968). However, it is plain from the testimony that the word "typewriter" has another more specific commercial meaning. This commercial meaning is well established, definite, uniform, and general through the typewriter trade. The commercial meaning incorporates certain standards which the imported article fails to satisfy. Because it fails, it is not classifiable as a "typewriter" according to the controlling commercial meaning of the word. Appellant thus overcame the presumption of correctness that had attached to the collector's classification.

It is interesting to note that the importation would not come within the scope of the legal definition of "typewriter," i. e., " * * * an instrument

operated by hand, and used largely in business requiring much correspondence with others, or in commercial transactions." Black's Law Dictionary, 1689 (4th ed. 1951); see Hooper v. Kennedy, 100 Vt. 314, 137 A. 194, 196 (1927). "A typewriter is a machine intended for use as a substitute for handwriting in a commercial sense, * * *." In re Tidball, 40 F.2d 560, 561 (D.Wyo.1930). The item in question lacks the features necessary to be useful in commerce or for correspondence.

It is doubtful that the item in question would be considered a "typewriter" in any popular sense. It simply does not measure up to what the public expects of a typewriter.

Having proved that the collector's classification was wrong, the appellant must, in addition, prove by a preponderance of the evidence that what he claims to be the proper classification is right. The appellant carried the burden and proved the imported article to be a toy. Henry Katz, who ran his own company selling and distributing toys for 50 years, testified that the Marx import was a toy. Katz was responsible for distribution of appellant's toy typewriter. He stated that in carrying out this responsibility he had encountered direct competition from the item in question in the toy market of the United States. He added that the Marx Co. had displayed its product at the annual "Toy Fair" held in New York City. To his knowledge it was sold only through toy sales channels. Lewis N. Masters, the Vice President of appellant Western Stamping Corporation testified that he dealt directly with the toy buyers of large national mail order houses and that in attempting to secure orders for his toy typewriter he had experienced competition from the imported item.

Appellant corporation's president James E. Thomson confirmed this testimony. He testified that the article had been competing with his product in the toy market of the United States since 1962. He knew that it cost $16.00 at retail toy outlets.

Despite the fact that the importation is sold only in toy sales channels and through toy outlets, Congress has established a "chief use" test for toys, i. e., "For purposes of the tariff schedules, a 'toy' is any article chiefly used for the amusement of children or adults." Headnote 2, subpart E, part 5, schedule 7, TSUS. " * * * [C]hief use is a question of actual fact which, * * * should be established on the basis of positive testimony representative of an adequate geographical cross section of the nation." L. Tobert Co., Inc. et al. v. United States, 41 CCPA 161, 164, C.A.D. 544 (1953). The appellant therefore must offer such positive testimony that the item in question is chiefly used for the amusement of children or adults. United States v. Bruce Duncan Co., Inc., 50 CCPA 43, 46, C.A.D. 817 (1963).

Appellant did exactly that, Henry Katz, certainly a toy expert, testified that, "A toy is any kind of a gadget or any kind of an object that provides play value, amusement, entertainment for a child." Then when asked, "Is Plaintiff's Exhibit 2 [i. e., the imported article] a toy?", he answered *"Yes."* [Emphasis added.]

These direct quotations from the record lead to the inescapable conclusion that the imported item provides amusement. Katz had sold toys throughout the toy market of the nation for 50 years. His testimony represents an adequate geographical cross section of the nation. It must be remembered that the appellees offered no contrary testimony.

In addition to this testimony, " * * * it is proper to consider * * *, the characteristics of the merchandise itself." United States v. Colibri Lighters, 47 CCPA 106, 109, C.A.D. 739 (1960). "A sample of merchandise in issue, * * * is a very potent witness." United States v. Halle Bros. Co., 20 CCPA 219, 221, T.D. 45995 (1932). An inspection of the imported item itself drives one to the conclusion that it is a toy.

The Customs Court in its opinion wrote that the importation, like the appellant's competing "Tom Thumb" toy typewriter,

could be used to, " * * * 'do homework, learn spelling, improve letter writing and neatness,' [The Henry Katz Organization 1967 Catalogue] none of which [was] deemed by the court as constituting amusement." Western Stamping Corp. v. United States (Louis Marx & Co., Inc., Party in Interest), Cust.Ct., 289 F.Supp. 1016 (1968). In other words, the chief use could be educational. However, Thomson the appellant corporation's president who developed the "Tom Thumb" refuted this reasoning when he testified that it was not designed as an educational tool. Henry Katz testified that he had attempted to sell a toy typewriter to toy houses specializing in educational toys, but that, "They have been unwilling to buy it." Dr. Lloyd, the typewriting education expert, did not consider the imported article a learning instrument. "To take a child who is eager to learn something and put him on a machine that at first frustrates him and prevents his ever becoming an expert would be educational treachery." He felt that any training on the Marx machine would be a handicap.

It is manifest from the evidence as a whole that the purpose of labelling the imported article as a typewriter is to avoid payment of duties on toys with which it competes in the market, and to enter duty free along with regular typewriters with which it does not compete.

Regardless of one's views on the merits of the tariff system, all must agree that whatever tariff duties are levied should be applied fairly and without discrimination. This is the declared purpose of Congress, yet the net effect of affirmance would be to permit discrimination.

For a court to permit an importer who knows that an item will be distributed exclusively through toy marketing channels and never sold through typewriter marketing agencies, to bring in the article duty-free, merely through the guise of labelling, would in effect strike down the intent of Congress in enacting the applicable tariff provision. Rank discrimination would be the inevitable effect of such an interpretation.

All this evidence viewed as a whole supports appellant's claim that the merchandise in question is a toy and that its chief use is for amusement. Thus because the appellant carried the two burdens required of him, I am persuaded the case should be reversed.