(C.D. 4688)

IDEAL TOY CORP. *v.* UNITED STATES

Court Nos. 71-6-00211, etc.

(Decided February 7, 1977)

*Sharretts, Paley, Carter & Blauvelt* (*Patrick D. Gill* and *M. Barry Levy* of counsel) for the plaintiff.
*Irving Jaffe*, Acting Assistant Attorney General (*Saul Davis*, trial attorney), for the defendant.

LANDIS, Judge: These consolidated actions [1] involve the question of whether an inflatable article described on the invoices as "inflatable baby tender chair" or "Ideal's Baby-Me Play Float" was properly classified by customs officials as a toy, dutiable under TSUS item 737.90 at various rates depending on the date of entry,[2] or should be classified as plaintiff claims, as an article of the class or kind properly classifiable under the tariff provision for pneumatic mattresses and other inflatable articles, not specially provided for, under TSUS item 790.39, also at various rates.[3]

The imported articles are one and the same article manufactured and exported from Japan. They were imported at the ports of New York, Baltimore, Houston, Boston, Savannah and Los Angeles.

Responding to the request by plaintiff for admissions, defendant has admitted that the imported articles are inflatables and concedes that if not dutiable as toys, then the inflatables are properly dutiable as inflatable articles, not specially provided for. In the context of those admissions, the only issue in this case is whether the imported inflatables are "toys." As defined in the tariff schedules (schedule 7, part 5, subpart E, headnote 2), a toy "is any article chiefly used for the amusement of children or adults." Customs officials are presumed to have found each and every fact necessary to support the presumption [4] that the chief purpose of the imported inflatables is amusement. *E. I. du Pont de Nemours & Co.* v. *United States*, 27 CCPA 146, 149, C.A.D. 75 (1939). Plaintiff's burden is to prove that the chief purpose

---

[1] On written motions, ten actions were consolidated for trial, without objection.

[2] Duty was assessed under TSUS item 737.90 at the following rates: 21% (1971) and 17.5% (1972 and post-1972).

[3] The rates of duty claimed under TSUS item 790.39 are: 7% (1971) and 6% (1972 and post-1972). Plaintiff has abandoned the claims set forth in the complaint under TSUS items 774.60 and 727.48. These claims will accordingly be dismissed.

[4] 28 U.S.C. 2635(a).

of the inflatables is not amusement. *United States* v. *New York Merchandise Co., Inc.*, 58 CCPA 53, C.A.D. 1004, 435 F.2d 1315 (1970).

The imported article is obviously intended to be utilized by a young child in the water. When inflated, the article is more square than round, and has a hole in the middle. The bottom is one piece with two leg holes that fashion the bottom into a sling-like seat. Other features include a so-called inflated backrest and an inflated hand-rail with two upright inflated supports all inflatedly integral. There are four variously colored rings that can be played with, that is, twirled or moved laterally on the inflated handrail. The bottom sling seat, backrest and handrail supports are a bright orange color. The top half of the inflated article is white with graphics of whimsical animals, faces, sun faces, flowers, etc. in orange, yellow, green and blue colors that obviously appeal to child-like fantasies. On the white part of the inflated article there is imprinted information that the article is an "Ideal" product "Made in Taiwan" and a warning "CAUTION Not a Life Saving Device Use With Parental Supervision." [5]

The imported article is sold deflated in a cardboard container [6] entitled "baby-me Play Float" that prominently depicts a picture of a mother with baby in a pool. The baby is seated in the inflated article floating on the water, the mother is standing in the water behind the baby with her hands on the backrest. Both mother and baby are smiling. The scene is obviously keyed to enjoyment.

On the front side of the container, alongside the mother and baby, is printed the following message:

> An inflatable baby seat that encourages baby to enjoy the water. Colorful foam filled vinyl rings add unlimited play. Useful head rest adds extra comfort. Safety valve out of baby's reach. This quality toy makes a perfect gift.

On the reverse side of the container are multicolored graphics of small children, pail and shovel, boat, sand, sun, bird, butterflies and flowers and a cautioning note that states:

PLEASE NOTE:

> This Baby Seat provides a safe and confortable way for your baby to enjoy the water. As all responsible parents realize, a young child, unable to swim, cannot and *must* not be left entirely alone in the water. Most small children will not be able to climb out of this seat and most children will not be able to tip this. However, if they do start rocking it, and, particularly if this motion is aided by waves in the water, there is the possibility that it can be overturned. Therefore, be sure to continue your usual precautions in watching your child's activities. [Emphasis quoted.]

---

[5] Exhibit 1–A.
[6] Exhibit 1–B.

The record consists of the testimony from seven witnesses for plaintiff [7] and four witnesses for defendant.[8] There are ten exhibits for plaintiff [9] and seven exhibits for defendant [10] in evidence.

The transcribed record of the testimony runs approximately three hundred pages. For all that, except for nuances in the differing opinions on the question of whether the "Baby-Me Play Float" is a toy or not a toy, the testimony does nothing more than cumulatively corroborate the purpose of the play float as stated and depicted on the container in which it is sold. The container shows a mother attending baby seated in the inflatable float playing in the water. There is no dispute with the fact that the baby does not play with the float so much as it plays with the water—splashes, paddles the water with its feet and generally interacts with a parent or attending adult in biplay of sorts. None of the witnesses had observed a child more than two years or less than six months old seated in the play float, and there is at least tacit agreement that in water play both adult and child are amused. I find no evidence to the contrary.

Additionally, it is plaintiff's testimony that the play float was designed for preschoolers solely as a very functional water tender type seat; that the "Baby-Me" term is registered as a trademark with the

[7] The following witnesses testified for plaintiff:

Miriam Gittleson – executive assistant and director of the import-export department of Ideal Toy Corp.

Anthony Landi – senior vice president of Ideal Toy Corp.

Edward Engel - physical education teacher, Board of Education, City of New York.

Stewart Sims – employed by Ideal Toy Corp.

Arnold Henning – import specialist, Customs Service, New York.

David Tito - import specialist, Customs Service, New York.

Miriam Graff - employed by Sunshine Contracting Corp., Passaic, New Jersey.

[8] The following witnesses testified for defendant:

Ascher Chase – executive vice president and general manager of General Foam Plastics Corp., doing business in flotation devices for swimming pools.

Sidney Silverman – vice president of sales for Coleco Industries, *inter alia* doing business in flotation devices for swimming pools.

Sam Cynamon – field representative for safety programs, American Red Cross in Greater New York.

Dr. Joseph Church – professor of child psychology, Brooklyn College, City University of New York. Exhibit F a resume of Dr. Church's work in the field of child psychology, received in evidence without objection.

[9] Plaintiff's exhibit 1-A is the imported article and exhibit 1-B is the container, *supra.*

Exhibits 2, 3, 4, 5 and 6 are photographs of a baby seated in the imported article floating in a pool, alone or with an adult, taken during a demonstration of how the article is used.

Exhibits 7, 8 and 9 are photographs, taken during the same demonstration, of an adult standing with baby seated in a flotation device in a pool. The baby is seated in the Ideal Toy Corp. "Baby-Me Love Bug Play Float" in exhibit 7, and the Ideal Toy Corp. "Baby-Me Tug Boat Play Float" in exhibits 8 and 9.

Exhibit 10 is a picture of an adult lying on a floating chaise lounge, at page 21 of defendant's exhibit D.

[10] Defendant's exhibit A is a photocopy of Ideal Toy Corp. registered trademark for "Baby-Me" inflatable floats, in class 22 for games, toys and sporting goods. 37 C.F.R. 6.2.

Exhibit B is restricted to pages 6, 16 and 17 of Ideal Toy Corp. 1972 catalogue depicting the imported inflatable article and various other inflatable articles for use in water recreation.

Exhibit C is a noninflatable flotation ring with a sling-like seat, sold by General Foam Plastics Corp.

Exhibit D is a General Foam Plastics Corp. 1975 catalogue, limited to page 22 depicting scenes of babies seated in devices like exhibit C, floating in the water under the eye of an adult.

Exhibit E consists of page 23 of the 1973 Coleco Industries catalogue, *inter alia* depicting a "Yogi Bear Head Ring" to keep "little dippers" heads up out of the water; a "Six Panel Ring" (i.e., six colored panels) flotation device, and a simulated canoe flotation device.

Exhibit F is a resume of Dr. Church's qualifications.

United States Patent Office in class 22 covering games, toys, and sporting goods;[11] that the play float is sold through toy stores or departments only because they get "greater traffic and, consequently, greater sales" than a baby store or department; that the term "toy," describing the play float was used merely as a "descriptive phrase" to convey a sense of enjoyment and recreation to the buyer; that the term "Play Float" is an all inclusive term conveying a sense of recreation, play ("Play is recreation. Play is enjoyment."); that the whimsical graphics on the play float are obviously geared to the fantasies of a child and that the colored rings were placed on the support bar to divert the child, and, at the same time, teach the child some color recognition.

On this record, the only question left open to the differing opinions of the witnesses is whether the "Baby-Me Play Float" is a toy. The opinion testimony addressed to that question is divided. I weigh the testimony to be about equal, that is, no stronger for plaintiff than for defendant. Plaintiff's witnesses opined that the purpose of the float was to support the baby and get the baby into the water; that the baby's amusement, alone or interacting with an attending adult, was induced by play with the water and not with the float as such. For that reason, they testified that the play float was not a toy. None of defendant's witnesses had observed a child seated in the imported play float in the water, but all had observed children at play in the water with similar types of articles. In sum, defendant's witnesses testified that the play float was a toy because it was the vehicle that enabled the baby to amuse itself in the water, alone or interacting with an adult who would also be amused.

Defendant contends that plaintiff has not overcome the presumption that, as classified, the play float is a toy. In support, defendant argues that plaintiff has failed to produce any evidence that the use of articles of the class or kind to which the play float belongs, to wit, water inflatables that are used and played with in the water, cf. Davis Products, Inc., et al. v. United States, 65 Cust. Ct. 367, C.D. 4105 (1970); Same v. Same, 60 Cust. Ct. 68, C.D. 3262, 279 F. Supp. 448 (1968), are not chiefly used for the amusement of children or adults.

Plaintiff's case ultimately rests on the argument that the purpose of the play float is chiefly utilitarian because the baby does not play with the float and, for all practical purposes, the play float does nothing more than it was designed to do, support the baby in the water.

I am not going to gainsay that a float that is designed to support a baby in the water does not serve some practical or utilitarian purpose. A baby is not old enough to appreciate the utility, but an attending adult is. It is a fact, however, that the play float also incorporates

---

[11] 37 C.F.R. 6.2.

features that have no utility and the play float is "obviously for a child." When amusement and utility become locked in controversy, the question becomes one of determining whether the amusement is incidental to the utilitarian purpose, or the utility purpose incidental to the amusement. *United States* v. *Globe Overseas Corporation*, 13 Ct. Cust. Appls. 10, T.D. 40849 (1925); compare, *H. Boker & Co. (Inc.)* v. *United States*, 19 Ct. Cust. Appls. 27, 29, T.D. 44870 (1931). Moreover, the utility of the inflatable article in this case and the amusement associated with it are not, in my opinion, mutually exclusive uses. On the record, I conclude that plaintiff has failed to overcome the presumption that the play float is chiefly used for the amusement of children or adults.

At the outset, plaintiff concedes that to be a toy, an article does not have to be a plaything, that is, it does not have to be played with, provided the quality or emotion induced by the article or use of the article takes on the character of frivolous amusement derived from an article which is essentially a plaything. *United States* v. *Topps Chewing Gum, Inc.*, 58 CCPA 157, 159, C.A.D. 1022, 440 F. 2d 1384 (1971); *Wilson's Customs Clearance, Inc.* v. *United States*, 59 Cust. Ct. 36, C.D. 3061 (1967) ("papier mache dogs" and "papier mache ware" for display or ornamentation held not dutiable as toys).

The merchandise in *Topps Chewing Gum, Inc.* consisted of objects variously labeled as "Wise Guy Buttons," "Smarty Buttons" and "Ugly Buttons." Each of the objects consisted of a round metal disk about two inches in diameter with a metal pin attached to the back. Humorous sayings and/or designs were printed in color on the front of the objects. Customs officials classified the objects as toys, not specially provided for. The Customs Court found that the objects were designed to be worn rather than played with; that the chief use was for wearing, and held that the objects were, accordingly, properly classifiable as buttons of metal. On appeal, the Court of Customs and Patent Appeals reversed the Customs Court stating:

> The court concluded from the evidence that the chief use of the imported objects was "wearing." We have no quarrel with that conclusion. Where we differ with the court below is in its reasoning that "wearing" and "amusement" are mutually exclusive. The court reached this result through an unduly narrow construction of the term "amusement." After noting that prior to the enactment of the TSUS a "toy" was defined as a child's plaything, the court cited *Wilson's Customs Clearance, Inc.* v. *United States*, 59 Cust. Ct. 36, C.D. 3061 (1967), for the proposition that the TSUS removed the limitation regarding the users' age but left the requirement that the object be a plaything. We think this conclusion is unsupported by the wording of the TSUS or by case authority. In the *Wilson's* case the court did not hold that to be a toy an object had to *be* a plaything,

but that the "character of amusement involved was that derived from an item which is essentially a plaything." *Id.* at 39. The court thus stressed the quality of mind or emotion induced by the object as controlling, and we think that is the best approach to interpreting the TSUS definition. If the purpose of an object is to give the same kind of enjoyment as playthings give, its purpose is amusement, whether the object is to be manually manipulated, used in a game, or, as here, worn. We think the evidence is clear that the fun children derive from wearing the imported buttons is essentially the same kind of frivolous enjoyment they would derive from objects which we commonly think of as toys. Accordingly, we find that the importer failed to establish that the chief use of the imported buttons was other than amusement. The presumption of correctness of the Collector's classification was therefore not overcome. [58 CCPA at page 159.]

The record in this case establishes that the emotion induced in a child of six months to two years of age seated in the play float in the water is amusement. The child spashes the water, paddles its feet and responds to improvised play with an interacting parent or adult. The utility of the play float is that it does tend to support the child in the water. That support is not, however, unqualifiedly a safe support, because by "rocking it" there is "the possibility that it can be overturned." (Exhibit 1–B.) I have to believe that the utility of a play float, obviously for a child, bearing warning that it can be overturned by "rocking it" is suspect. Use of the play float by a child in the water, unattended by a parent or adult, is not recommended. It strikes me, therefore, that the prime motivation for a parent or an adult seating the child in the play float in the water is to amuse the child, and not the qualified utility of the play float, to safely support the child. As one witness testified, one essence of a child's enjoyment is movement, and the sensation of floating in the water would itself tend to amuse a child. The customs classification as a "toy" is also cumulatively buttressed by the evidence that the play float is obviously directed to a child's fantasies; that it is called a toy, trademarked as a toy (it is not a game or sporting equipment), and sold in toy departments at retail.

Plaintiff having failed to establish that the chief use of the imported play float was other than amusement, the presumption of correctness attaching to the classification by customs was not overcome, and these consolidated actions [12] are dismissed.

Judgment will enter accordingly.

---

[12] Schedule A lists the court actions, protests and entries covered by the complaints in these consolidated actions.

Schedule B covers the disposition of protests identified in the summons commencing the consolidated actions which plaintiff failed to prosecute by complaint.

Schedule C, *inter alia*, reflects the disposition of affirmative defenses recited in defendants' answers to the complaints in the consolidated actions admitted by plaintiff.

All the schedules are attached to and made a part of the decision and judgment in these consolidated actions.