SLIP OP. 00-138

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: JAMES L. WATSON, SENIOR JUDGE**

|  |  |  |
|---|---|---|
| | : | |
| **ERO INDUSTRIES, INC.,** | | **Court No. 98-01-00053** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | | |
| | : | |
| **UNITED STATES,** | : | |
| **Defendant.** | | |
| | : | |

[Plaintiff's motion for summary judgment granted; defendant's cross-motion for summary judgment denied; final judgment entered for plaintiff.]

Decided: October 19, 2000

Sonnenberg & Anderson (Paul S. Anderson and M. Jason Cunningham, Esqs.) for plaintiff.

David W. Ogden, Acting Assistant Attorney General; Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice; Sheryl A. French, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of counsel, for defendant.

**OPINION AND ORDER**

**INTRODUCTION**

**WATSON, SENIOR JUDGE:**

At issue is the proper classification under the Harmonized Tariff Schedule of the United States ("HTSUS") for certain merchandise imported by plaintiff from China which is described in the commercial invoices and other entry documents as "playhouses," "play or slumber tents," and "vehicle

tents" (collectively, the "imports" or the "subject merchandise").  The subject merchandise comprises

tent-like articles that include a vinyl shell having colorfully imprinted on the exterior licensed copyrighted

and trademarked graphics depicting various fictional children's characters and images and a supporting

framework of interconnected elastic-corded PVC poles and connectors.

The imports were classified and assessed with duties by the United States Customs Service

("Customs") under either subheading 3926.90.98, HTSUS, as "[o]ther articles of plastics," or

subheading 3924.90.55, HTSUS, as "[t]ableware, kitchenware, other household articles and toilet

articles, of plastics: Other: Other."[1]  Plaintiff claims that the imports are properly classifiable as toys

under Chapter 95, subheading 9503.90.00, HTSUS, and hence are duty free.

This classification dispute falls within the court's jurisdiction under 28 U.S.C. § 1581(a).

The parties have cross-moved for summary judgment pursuant to USCIT Rule 56 asserting there are

no genuine issues of material fact for trial. For the reasons set forth hereinafter, the court finds there are

no genuine issues as to any material fact and that the classification dispute may be resolved by summary

judgment pursuant to Rule 56.

## THE RECORD

For evidentiary support of their respective summary judgment motions, the parties have

---

[1]Customs' different classifications of the imports may be attributed to the following: On April 14, 1998, Customs, after notice and comment, issued Headquarters Ruling Letter ("HQ") 961060 (1998 WL 691492), which ruled that the subject merchandise is properly dutiable under subheading 3924.90.55 at the rate of 3.4% ad valorem, and revoked a prior classification ruling , HQ 959629, issued on April 17, 1997 (1997 WL 470329), that had posited that the merchandise is dutiable at the rate of 5.3% ad valorem under subheading 3926.90.98.
.

submitted the deposition testimony of certain members of Ero's managerial staff: Lizbeth Scott, (taken

on January 18, 2000), Debra S. Silberman ( taken on January 19, 2000), and Valerie L. Schreck

(taken on January 19, 2000); documentary and physical exhibits; responses to interrogatories and

requests for production of documents; an affidavit of Ms. Silberman; United States Customs

Headquarters Ruling Letters; a United States Customs Service internal memorandum of September 19,

1996; the pleadings. The court also has considered the statements of disputed and undisputed material

facts filed by the parties pursuant to Rule 56(h) (formerly Rule 56(i)).

## UNDISPUTED MATERIAL FACTS

Each imported article comprises a relatively thin (0.15 millimeters in thickness) polyvinyl

chloride fabric (plastic) shell imprinted with various colorful licensed graphics depicting children's

fantasy characters and images (more specifically described below), which fabric is, in a tent-like

fashion, draped over and assembled with 1.3 millimeters diameter PVC (plastic) corded poles and

polyethylene (plastic) connectors.  The imports present several different tent-like structural

configurations, characterized by the parties as: "playhouses," "play or slumber tents," and "vehicle

tents."

The "playhouse," i.e., "Barbie Play House" (see Addendum I), resembles the shape or

configuration of a conventional house having a rectangular base and a gable (angled) type roof.

(Schreck Dep. Tr. at 18-19.) The playhouse typically measures 40 inches in length, 30 inches in width,

and 44 inches in height, and therefore, could be characterized as a miniature playhouse.

The "slumber tent" (or "play tent"), i.e., Disney's "Pocahontas Slumber Play Tent" (see

Addendum II), is domed-shaped (resembling the upper portion of a covered wagon) (Scott Dep. Tr. at

35; Schreck Dep. Tr. at 19). The only significance of the term "slumber" is that it indicated to Ero's retailers that the merchandise was a Slumber Shoppe product (Scott Dep. Tr. at 42; Schreck Dep. Tr. at 41). "Slumber tents" and "play tents" refer to the same articles (Silberman Dep. Tr. at 25). These articles have a standard height of 33 inches, a rectangular base that is 45 inches long and 33 inches wide. The size of these imports accommodates simultaneously only one or two small children (Schreck Dep. Tr. at 44).

A "vehicle tent" simulates and presents a theme of a particular vehicle, such as Disney's Toy Story Play Space Ship ("Buzz Lightyear") (see Addendum III), a car, a fire truck, Batman's vehicle, GI Joe's vehicle, etc.). These imports have variable dimensions, depending upon the vehicles' theme (Scott Dep. Tr. at 36, 40; Schreck Dep. Tr. at 20). To enhance the amusement or play value of the vehicles for children, they "are a little more elaborate [than the playhouses and slumber tents] and contain a number of play features that carry out the theme of the tent, including a steering wheel and working lights or horn." (See Customs' Memorandum of September 19, 1996, p. 2.) The steering wheels are "three dimensional plastic toy steering wheels that did not function [and which were] there for pretend play," viz., the child pretends to maneuver a vehicle (Scott Dep. Tr. at 76). Deponent Scott testified that some vehicles, like the Batman play vehicle and Jurassic Park play vehicle, had steering wheels connected to the framework of the articles (Scott Dep. Tr. at 76).[2]

---

[2] Defendant's Statement under USCIT Rule 56(h), paragraph 15, denies that any of the imported merchandise contained noisemakers, steering wheels, or other auxiliary play features. However, defendant failed to submit affidavit, deposition, or any other evidence controverting the deposition testimony of Ms. Scott (Scott Dep. Tr. 76) as to the auxiliary play features. Additionally, Customs' Memorandum of September 19, 1996, p. 2, acknowledges that the vehicle tents contained play accessories. In light of the foregoing, defendant's bald denial in its statement under Rule 56(h),

When children "play" with a product, "they are amusing themselves in any fashion while interacting with that product." (Scott Dep. Tr. at 79). With respect to the imports, "play" would be "active play" or "fantasy play." "Active play" with the imports might involve the use of other articles, like a tea set, a car, or other toys, while "fantasy play" would require only the use of the child's imagination to fantasize that the import is a fort, a car, a castle, or doll house (Schreck Dep. Tr. at 45-46). The subject merchandise is "geared toward children three to eight years old" (Scott Dep. Tr. at 34; Silberman Dep. Tr. at 45); toddlers would simply climb in and out of the articles or sit inside (Silberman Dep. Tr. at 46). Since plaintiff considers the imports as "play products," no attempt was made to prolong their useful life by using a textile fabric shell which would be more durable than plastic material that has less resistance to ripping (Scott Dep. Tr. at 46). The intended use of the subject merchandise is to facilitate the play activities of children, both inside and outside the products, and not camping or any extended outdoor use (Schreck Dep. Tr. at 45-46; Scott Dep. Tr., at 45-48, 54-56, 79-80).

The imports are designed for use in the home, but to a limited extent they may be used in the backyard. See  Memo of National Import Specialist Alice Wong of September 19, 1996 (Pltf's App. I, Exh. VI, at 4, 5). The imports are completely unsuitable for camping or other extended outdoor use, as they are not sufficiently durable or constructed for protection from the elements. They have an opening or slit at one end (the "door"), but no mechanism or device to seal the opening from insects or

unsupported by any evidence, does not raise a genuine issue of material fact as to whether the vehicle tents possessed the play accessories.

the elements; another opening in the shell, the so-called "window," lacks any sealing device or mechanism for closing the opening for protection against the weather. See Customs Rulings HQ 959629 and HQ 961060. Tents constructed for camping or other extended outdoor use are typically constructed of a durable textile fabric rather than light weight plastic. Although, the plastic fabric used in the shell of the imports meets flammability standards for tentage, plaintiff offers a "different kind of product than a camping tent."(Scott Dep. Tr. at 14). The imports are neither advertised nor recommended for extended outdoor usage, for shelter, or for camping (Schreck Dep. Tr. at 54-55). Quite the contrary, in its packaging, plaintiff cautions users: "This playhouse is not intended for camping usage or extended outdoor use" (Silberman Dep. Tr. at 40). Moreover, the imports were not designed to be secured to the ground with stakes, which obviously puts the light weight vinyl shells and plastic supporting poles in serious risk for instability under even moderate wind conditions.

The graphics printed on the exterior surface of the shells serve to create imagery and a theme in order to promote and facilitate children's play activities. Thus, plaintiff licensed for display on the imports such copyrighted and trademarked children's images as Mickey Mouse, Sesame Street, Winnie the Pooh, Lion King, Barbie, Regrats, Blues Clues, Teletubbies, Dalmatians, Buzz Lightyear, and Disney's Pocahontas (Schreck Dep. Tr. at 24; Silberman Dep. Tr. at 30; Pltf's Statement of Undisputed Material Facts, par. 22). Since children using the imports extensively play with them outside as well as inside the articles, the children's graphic displays and decorations are focused on the exterior surface of the shells to provide play themes and to stimulate a child's imagery and play activities. (Scott Dep. Tr. at 46, 79; Silberman Dep. Tr. at 46). When playing with the imported articles, children integrate the imagery created by the graphics printed on the shells with props such as dolls or other

things to play out a scene (Scott Dep. Tr. at 79-80). However, in addition to the children's amusement

generated by imaginative play activities stimulated by the graphics, the enclosure by the imports itself

affords amusement for young children. Thus, children play hide-and-seek or pretend to be in a "secret

place," and if they so wished, children could utilize the imports for napping. (Schreck Dep. Tr. at 44-

45; Deft's Statement of Undisputed Material Fact, par. 7). However, there was "not a chance" that

children would be found napping or sleeping in the articles - - "there was too much activity" and there

would be "very little sitting too." (Silberman Dep. Tr. at 46-48). The imports are a "play product"

(Scott Dep. Tr. at 46).

## PARTIES' CONTENTIONS

Plaintiff contends that the imports are "toy tents" (which accords with the characterization of the

imports by the National Import Specialist in a memorandum dated September 19, 1996) and not

camping tents, and therefore, the subject merchandise is classifiable as toys under subheading

9503.90.00, HTSUS. Further, plaintiff contends that the imports do not fall within the exclusion for

"tents or other camping goods" in Chapter 95, Note 1(u).

Defendant, on the other hand, contends that the imports per se are simply temporary "shelters"

or "enclosures" (viz., tents) having no amusement value, and therefore, they are not classifiable as toys.

Further, defendant argues that the imports fall within the exclusion for "tents or other camping goods" in

Chapter 95, Note 1(u), HTSUS. Finally, defendant maintains that the merchandise is properly

classifiable as "Other" plastic household articles under subheading 3924.90.55, HTSUS, in accordance

with Customs Ruling Letter of April 14, 1998.

## DISCUSSION

### 1.

### Standard of review.

Under USCIT Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." It is the function of the court to determine whether there are factual issues that are material to resolution of the action. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"[T]he Court of International Trade has not hesitated to decide classification cases on summary judgment when that was appropriate." Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998), and cases cited. Further, summary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is. Id. "Understood in that manner, there is nothing inherently incompatible with the summary judgment process if the court construes the relevant (competing) classification headings, a question of law, determines what the merchandise at issue is, a question of fact; and if there is no genuine dispute over the nature of the merchandise, adjudges on summary judgment the proper classification under which it falls, the ultimate question in every classification case and one that has always been treated as a question of law." Id., at 1366. Here, there is no genuine dispute as to any material fact concerning exactly what the merchandise is or as to its use, and accordingly, summary judgment as to the classification issue in this case is appropriate

**2.**

**The imports are classifiable as toys.**

Plaintiff argues that the imports were designed, constructed, and used solely by children for amusement during play activities, and therefore, are classifiable as toys. Defendant, however, insists that the imports per se have no amusement value, but serve solely as articles of practical utility, viz., a "shelter" or "tent," in that they simply provide children with an enclosed space or "base" for play and other activities.

The meaning of the term "toy" is a question of law. Childcraft Education Corp. v. United States, 742 F.2d 1413 (Fed. Cir. 1984). The term "toy," however, not defined in the HTSUS, and therefore, the court may seek guidance from the common meaning of the term. Fundamentally, the common meaning of a term may be gleaned from lexicographic authorities. Webster's Third New International Dictionary of the English Language, Unabridged (1986), p. 2419, defines "toy" as: **3a:** something designed for amusement or diversion rather than practical use **b:** an article for the playtime use of a child, either representational (as persons, creatures, or implements) and intended esp. to stimulate imagination, mimetic activity, or manipulative skill, or nonrepresentational (as balls, tops, jump ropes) * * *. Although not legally binding on the court, Chapter 95, HTSUS Explanatory Notes, Vol. 4, heading 95.03 (1st Ed. 1986), is relevant. ("This Chapter covers toys of all kinds whether designed for the amusement of children or adults.") (Emphasis added.) See also Additional U.S. Rule of Interpretation 1(a), HTSUS, regarding tariff classifications controlled by use (controlling use is principal use).

It is beyond peradventure that young children derive "amusement" not only from the stimulation of their imagination by the fictitious children's characters and images imprinted on the imports, but also

from the function of the imports to enclose the child while "playing fort," "playing house," playing "hide-and-seek," and pretending to maneuver a spaceship, a car, etc. Hence, the enclosure afforded by the imports, its theme as a miniature house, vehicle, and the imagery stimulated by the graphics are all inextricably linked as the elements of the amusement afforded by the imports. Thus, deponent Schreck testified (Dep. Tr. 44-45):

> Q. And what would be the advantage of playing inside? You could just do that in a room.
>
> A. Yeah, but this is yours. This your place. This is like your secret place and nobody can see you and you can hide and you can do like, you know, magic things in their maybe.
>
>        \*     \*     \*     \*
>
> Q. And the play would be both active play and fantasy play?
>
> A. Yes, active play would be, in my opinion, you could have other articles in there with you, like a tea set or a car or other toys, something that you could physically touch and do something with. Fantasy play, you only need imagination, or may you need your imagination, and, like, maybe a stick. And then you fantasize about it's your fort or it's your, I don't know, or it's your car, or it's your castle. It's your doll house.

Judicial precedents addressing the classification of merchandise having both utility and amusement aspects are instructive in this case. Thus, in Childcraft Education Corp., 742 F.2d at 1415 (Fed. Cir. 1984), the Federal Circuit approved the determinative issue as couched by the trial court, citing Ideal Toy Corp. v. United States, 78 Cust. Ct. 28, 33, C.D. 4688 (1977), "[w]hen amusement and utility become locked in controversy, the question becomes one of determining whether the amusement is incidental to the utilitarian purpose, or the utilitarian purpose incidental to amusement."

In Childcraft, certain machines known as "Teaching Typewriters," "Touch to Learn," and "Touch and Match," used by pre-school children for educational purposes, were held by the appellate court, after an evaluation of the evidence under the "clearly erroneous" standard of review, not to be chiefly used for amusement but for educational purposes, and therefore, the Federal Circuit reversed the trial court's determination that the imports were properly classified by Customs as toys. Likewise, in Pez Haas, Inc. v. United States, 46 Cust. Ct. 290, Abs. 65026 (1961), dispensers of peppermint candy imported and sold with a quantity of peppermints, and simulating a space gun (with the peppermints in the magazine compartments), used exclusively by children as a dispenser of the peppermint candy and never used without candy, were held to be candy dispensers, and the amusement derived by children from the dispensers was held by the court to be only incidental to their chief use as a candy dispenser. However, in Ideal Toy Corp., supra, the court held that a baby playfloat was classifiable as a toy since the practical use of the device to support a child in water was incidental and the merchandise was essentially for the child's amusement.

In Traveler Trading Co. v. United States, 713 F. Supp. 409 (CIT 1989), adult Halloween costumes, although wearing apparel (and as such had utility), were held chiefly used as toys for amusement rather than wearing apparel since wearing the costumes itself had amusement value. In United States v. Topps Chewing Gum, Inc., 440 F. 2d 1384 (CCPA 1971), round metal buttons imprinted with humorous slogans with a pin on the back so that they could be attached to and worn on clothing, and indeed exclusively so used, were nonetheless held properly classifiable as toys since the object of the buttons was to provide the same kind of amusement as playthings give.

See also Minnetonka Brands, Inc. v. United States, 110 F. Supp. 2d 1020 (CIT 2000),

Appeal Pending (imports of bubble bath packaging shaped and colored to represent well-recognized

children's characters or icons filled with bubble bath for retail sale were held by Judge Wallach to be

principally used by children for the product's amusement value after the containers were emptied of

bubble bath, and hence are classifiable as toys under the factors outlined in United States v.

Carborundum Co., 536 F.2d 373, 377 (Fed. Cir. 1976)).

There is a line of cases presenting the correct classification of certain merchandise having utility,

but  functional or structural deficiencies as compared with the standard counterpart articles (i.e., "Jr.

Editions" ), and used as well for amusement.

Thus,  in  Carson M. Simon & Co. v. United States, 66 Cust. Ct. 107, C.D. 4177 (1971),

ukuleles that functionally could be played as practical musical instruments, but were incapable of

producing a sustained tune similar to that produced by standard ukuleles used as musical instruments,

were held by the court to be chiefly used for amusement, and therefore, classifiable as toys, not musical

instruments.

In Montgomery Ward & Co. v. United States, 62 Cust. Ct. 718, C.D. 3853 (1969),

accordions that had some utility as musical instruments, but could not be used for serious musical study

because they had a shorter octave range and less bass notes than a standard beginner's instrument, and

were incapable of playing certain chords, were held to be toy musical instruments used for amusement,

and therefore, classifiable as toys rather than as musical instruments.

In William Shaland Corp. v. United States, 280 F. Supp. 457 (CIT 1968), telescopes sold at

sporting events, circuses, and carnivals were held properly classified as toys.

In George G. Wagner Co. v. United States, 43 Cust. Ct. 360, Abs. 63419 (1959), miniature

food mixers designed and used for training children to use adult food mixers, but which lacked the

essential character of utensils serving a utilitarian purpose, were held to be chiefly used for amusement,

and therefore, properly classifiable as toys.

In J.C. Penney Purchasing Corp. v. United States, 10 CIT 727 (1986), plaintiff challenged the

classification as toys of small, plastic replicas of cash registers incorporating a battery-operated

calculator, arguing that the articles had practical and educational utility as a calculator. Based primarily

on its examination of the samples of the merchandise, the J.C. Penney court found that the cash register

replicas were designed and chiefly used for children's amusement in play activities, rather than for use

as practical calculators. 10 CIT at 730. Significantly, the court pointed up that while the testimony of

record as to the use of the articles was quite limited,  the samples in evidence were probative of their

use, citing Oxford International Corp. v United States, 70 Cust. Ct. 217, 223, C.D. 4433 (1973)

("even where testimony as to actual use is very limited, the character and design of the sample itself may

compel a finding as to the primary use of the merchandise").

By contrast, in Western Stamping Corp. v. United States, 289 F. Supp. 1016 (CIT 1968),

aff'd 417 F.2d 316 (1969), nonstandard, cheaply constructed typewriters that they lacked some

common typewriter functions and were too inefficient and unsuitable for office use or instruction, but

nonetheless still had sufficient features to have utility as typewriters for less demanding functional tasks

as doing homework, learning spelling, and letter writing were held not to be classifiable as toys.

Similarly, in New York Merchandise Co. v. United States, 294 F. Supp. 971 (CIT 1969), cheaply

constructed baseball gloves similar in design, features and characteristics of professional baseball gloves

(viz., "Jr. Editions"), while inferior to professional gloves, were held by the court to be fully functional

gloves used in organized games of baseball rather than for amusement. As stressed by the court in New York Merchandise, based entirely on an examination of the exhibit itself, "when one places the sample glove on one hand and pounds the other fist into the pocket, it becomes apparent that the importation is no mere toy, but a regular baseball glove modeled after those used by professional players." Id. at 974.

In the current case, while the imports may simulate the structural format of a tent, and have some utility as an enclosure in which children may play, they are clearly not practical tents or structures used as shelters. Rather, the tent format per se affords the element of enclosure or containment which for young children has enormous amusement value in certain play activities. To the extent that such enclosure feature has any utility to young children, such utility is clearly incidental to its amusement value.

In addition to the amusement derived by young children in various play activities based on the enclosure afforded by the imports, the imports per se have amusement value engendered by the colorful licensed graphics of children's characters that create imagery and foster fantasy play both inside and outside the articles. Deponent Scott, a former Vice-President for Marketing for plaintiff, testified:

> [T]he children who used the [imported] products considered the products as an extension to imagery - - imaginative play.
>
> They played inside as well as outside the playhouses; and therefore, we focused all our graphic design and decorating on the outside of the playhouse since they were playing a good portion of the time outside the playhouse and not inside of the playhouse.

Scott Dep. Tr. at 46. "Importers, merchants, and executives concerned with ordering, selling, distributing and promoting an article have to know the article's chief use and properly give testimony as

to such use." Childcraft Education Corp., 742 F. 2d at 1416, quoting B. Shackman & Co. v. United

States, 67 Cust. Ct. 372, 383 (1971)

In addition to amusement fostered by the import's features of enclosure, simulation of miniature

houses and vehicles, and of course the graphics, the merchandise described as "vehicle tents" have such

features as mock steering wheels, that serve to further enhance the "pretend" or amusement value of a

simulated vehicle. While obviously a young child could nap in a simulated space ship or playhouse,

defendant's deponent Ms. Silberman testified without contradiction that there was "not a chance" that

children would nap rather than play (Silberman Dep. Tr. at 46-48). Plaintiff's advertising for the

subject merchandise stresses that the imports are "great for indoor and outdoor fun" (emphasis added),

strongly suggesting cognitive amusement rather than somnolence or napping.

**3.**

**The tents covered by the Chapter 95, Note 1(u) exclusion for "tents or other camping goods"
are camping tents; the subject imports are not camping tents.**

Chapter 95, Note 1(u) reads:

Notes

1. This chapter does not cover:

(u) Racket strings, <u>tents or other camping goods</u>, or gloves

(classified according to their constituent material).

[Emphasis added.]

Defendant argues that classification of the imports under subheading 9503.90, HTSUS, is precluded by the exclusion of "tents or other camping goods" under Chapter 95, Note 1(u). Plaintiff, however, contends: the imports do not fall within the common meaning of "tent" since they are not designed or constructed to be used as "shelters"or to afford protection against the elements; even if the imports fall within the common meaning of "tent," the Chapter 95, Note 1(u), exclusion for tents relied on by defendant covers only <u>camping</u> tents. As indicated <u>supra</u>, the imports are not used for camping.

Focusing solely on the term "tents" in Note 1(u), defendant argues that the imports fall within the Chapter 95, Note 1, exclusion for "tents or other camping goods." The meaning of a tariff term is a question of law. <u>Mead Corp. v. United States</u>, 185 F. 3d 1304, 1306 (Fed. Cir. 1999), <u>cert. granted</u>, 120 S. Ct. 2193 (May 30, 2000); <u>Totes, Inc. v. United States</u>, 69 F. 3d 495, 498 (Fed. Cir. 1995); <u>Brookside Veneers, Ltd. v. United States</u>, 847 F.2d 786, <u>cert. denied</u>, 488 U.S. 943 (1988). There is no statutory definition of the term "tents" as used in Chapter 95, Note 1(u) or elsewhere in the HTSUS. Defendant argues that except for the fact that the subject articles are made of plastic rather than textile fabric,[3] they would fall within the definition of "tents" in the Explanatory Notes to heading 6306, HTSUS:

---

[3] The tents classifiable under heading 6306 are only those made of <u>textile</u> materials. Plastic products must be classified elsewhere under various tariff provisions based on use, constituent materials, etc.

> Tents are shelters made of lightweight to fairly heavy fabrics of man-made fibers, cotton or blended textile materials, whether or not coated, covered or laminated, or of canvas. They usually have a single or double roof and sides or walls (single or double), which permit the formation of an enclosure. The heading covers tents of various sizes and shapes, e.g., marquees and tents for military, camping (including backpack tents), circus, beach use. They are classified in this heading, whether or not they are presented complete with their tent poles, tent pegs, guy ropes or other accessories. [Emphasis added.]

The term "tent," is defined in Webster's Third New International Dictionary, Unabridged, 1968, p. 2356, as: "**1:** a collapsible shelter of canvas or other material stretched and sustained by poles, usu. used for camping outdoors (as by soldiers or vacationers) * * *. (Emphasis added.)  Other dictionary definitions of tents cited by defendant refer to shelters supported by poles and fastened by cord to pegs driven into the ground. Deft's Mem. at 18.  As previously indicated, the imports are not designed for attachment to the ground and they are not used for camping.

Defendant maintains that the imports are used as a temporary "shelter," viz., an enclosed interior space. Plaintiff, however, while not disputing that the imports provide interior space, insists they are not "shelters" in the sense they are designed or constructed to provide protection from the elements.

 The court agrees with plaintiff that the term "shelter" as used in most definitions of "tent" refers to temporary structures used for protection against the elements. The imports while affording some enclosure,[4] are not "shelters" within most definitions of the term "tent" since the imports were neither designed nor constructed for protection against the elements. Plaintiff cites a series of published Customs Headquarters Ruling letters, Pltf's Mem. at p. 22, n. 52, in which Customs has consistently

---

[4] The vehicle tents only partially enclose a child (see addendum III).

taken the position that "[a]lthough the term 'tents' has been broadly construed by Customs to encompass many types of tents, all merchandise classifiable [as tents] in that heading must <u>provide a minimum threshold of protection against the elements</u>" (emphasis added).

The court also agrees with plaintiff that in the context of the exclusion of "tents or other camping goods" in Chapter 95, Note 1(u), the tents referred to are camping tents. Defendant's reading of the exclusion under Chapter 95, Note 1(u) that focuses solely on the term "tents" and turns a blind eye to the immediately following words, "or <u>other</u> camping goods" (emphasis added) construes the term tents in disregard of the context of the exclusion read as a whole.

Fundamentally, of course, courts interpret statutory language to carry out legislative intent. <u>Nippon Kogaku (USA), Inc. v. United States</u>, 673 F.2d 380, 383 (Fed. Cir. 1982). The first source for determining legislative intent is the statutory language. <u>United States v. Esso Standard Oil Co.</u>, 42 CCPA 144, 155 (1955). The words in Note 1(u) "or <u>other</u> camping goods" (emphasis added) immediately following "tents," establishes the context in which the term "tents" is to be applied, and thereby circumscribes, qualifies, and limits the type of tents that were intended by the drafters to be excluded from Chapter 95 to those falling within the purview of "camping goods" (<u>viz.</u>, camping tents).

In addition to context, plaintiff also urges the court to consider the <u>grammatical construction</u> of the exclusionary language with respect to the drafter's use of commas to set off the language, "tents or other camping goods." The manner in which commas are used grammatically expresses an intent to treat "tents or other camping goods"as a <u>separate unitary category of goods</u> rather than to read the term "tents" in isolation. <u>See</u> Strunk and White, <u>The Elements of Style</u>, 4th Ed., p. 93 (1993) (commas used to set off a phrase containing related words that function as a unit). If the term "tents" had been

intended by the drafters to be read as a separate, distinct, and stand-alone exclusion and unqualified by the following words "or other camping goods," as urged by defendant, Note 1(u) should have read, "racket strings, tents, camping goods, or gloves," thus obviating any need for using the words "or other." However, the foregoing words "or other" with the use of commas before "tents" and after "goods" are the words and grammatical construction used in Note 1(u).

Plaintiff also invokes the well-settled canon of statutory interpretation noscitur a sociis used to interpret statutory language by looking at associated words, See Black's Law Dictionary, Seventh Ed. (1999), p. 1084; Jewelpak Corp. v. United States, 97 F. Supp. 2d 1192, 1196 (CIT 2000), and authorities cited. In Note 1(u), the associated words "or other camping goods" suggest that the intended scope of the term "tents" is limited to those that are "camping goods."

### 3.

### Customs' rulings in this case are not entitled to deference.

Defendant concedes that the issue of whether the imports are classifiable as "toys," was not "fully addressed at the highest level of the Customs Service Headquarters, when it issued HQ 961060," a ruling that revoked its prior ruling in HRL 959629. Accordingly, even assuming arguendo that Customs rulings issued after notice and comment are generally entitled to deference,[5] see Genesco v.

---

[5] The court may interpret tariff provisions in accordance with a reasonable construction embodied in Customs regulations, Haggar Apparel Co. v. United States, 526 U.S. 380 (1999), citing Chevron Corp. v. Natural Resources Defense Council, 467 U.S. 837 (1984); Mead Corp. v. United States, 185 F. 3d 1304 (Fed. Cir. 1999), cert. granted, 120 S. Ct. 2193 (May 30, 2000). No regulations have been called to the court's attention relevant to the legal issues in this case. The Federal Circuit reiterated its holding in Mead that no deference should be accorded to Customs interpretations in ordinary rulings. See Carl Zeiss, Inc. v. United States, 195 F. 3d 1375 (Fed. Cir. 1999). Oral argument in Mead is scheduled for November 8, 2000 in the United States Supreme Court.

United States, 102 F. Supp. 2d 478 (CIT 2000), given the particular circumstances, neither ruling HQ

961060 nor the earlier revoked ruling, HRL 959629, are entitled to any deference.

## CONCLUSION

Because the subject merchandise is classifiable under Chapter 95, defendant's proposed

classification under Chapter 39 is precluded by Note 2(u), which expressly excludes from Chapter 39

the articles of Chapter 95. See  Minnetonka Brands, Inc., supra.  See also  Midwest Cannon Falls, Inc.

v. United States, 122 F. 3d 1423, 1429 (Fed. Cir. 1997). The rule of relative specificity in GRI 3(a)

dictates the same result inasmuch as the provision for toys claimed by plaintiff  is more specific than

Customs' basket provision classifications in this case. See Carl Zeiss, Inc. v. United States, 195 F. 3d

1375 (Fed. Cir. 1999).

For the reasons set forth above, plaintiff's motion for summary judgment is granted, and

defendant's motion for summary judgment is denied. The merchandise is properly classifiable  under

subheading 9503.90.00, HTSUS, and Customs is directed to reliquidate the entries as duty-free and

refund duties deposited with interest as provided by law.  A judgment to that effect is entered herewith.

Dated: New York, New York
      October 19, 2000

                                          James L. Watson, Senior Judge

Barbie™ Play House

Easy to Assemble No Loose Pieces

Interior Elastic Cord Keeps All Poles Connected For Easy Assembly!

Ages 3 and Up



